**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GALO COBA and COBA LANDSCAPING AND CONSTRUCTION, INC., individually, and on behalf of other members of the general public similarly situated, | |
| Plaintiffs, | Civ. No. 12-1622 (DRD) |
| v. | **O P I N I O N** |
| FORD MOTOR COMPANY, | |
| Defendant. | |

*Appearances by:*

SCARINI HOLLENBECK, LLC
By: Joel Glucksman, Esq.
     Harold Friedman, Esq.
1100 Valley Brook Avenue
PO Box 790
Lyndnhurst, New Jersey 07071

INITIATIVE LEGAL GROUP APC
By: Andrew J. Sokolowski, Esq.
1800 Century Park East, 2nd Floor
Los Angeles, California 90067

     *Attorneys for Plaintiffs*

LeCLAIR RYAN
By: Joseph F. Lagrotteria, Esq.
     Karol Corbin Walker, Esq.
One Riverfront Plaza
1037 Raymond Blvd., 16th Floor

Newark, New Jersey 07102

Dykema Gossett PLLC
By: Eric C. Tew, Esq.
1300 I Street, N.W.
Suite 300 West
Washington, DC 20005

*Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This matter arises out of Defendant Ford Motor Company's ("Ford") inability to cure a
defective fuel tank installed in a number of Ford F-Series Super Duty trucks and E-Series vans.
On March 14, 2012, Plaintiffs Galo Coba and Coba Landscaping and Construction, Inc. ("Coba
Landscaping") filed a Complaint against Ford, on behalf themselves and persons who purchased
one or more Class Vehicles,[1] asserting claims for breach of express warranty, violation of the
New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-2, breach of the implied warranty of
merchantability, common law fraud, breach of the duty of good faith and fair dealing, unjust
enrichment, and unspecified injunctive relief. The Complaint sought class certification, general,
special, incidental, statutory, punitive, treble, and consequential damages, attorney's fees, and
costs.

On April 4, 2012, Plaintiffs filed an Amended Complaint adding factual allegations in
support of their claims. On August 14, 2012, Plaintiffs filed a Second Amended Complaint
("SAC"), which withdrew Plaintiffs' claim for unjust enrichment and provided additional factual
allegations.

---

[1] These include all 2004-2007 Ford E-150 vehicles; 2004-2007 Ford E-250 vehicles;
2004-2007 Ford E-350 vehicles; 2004-2007 Ford E-450 vehicles; 1999-2008 Ford F-250 SD
vehicles; 1999-2008 Ford F-350 SD vehicles; 2003 and 2005-2008 Ford F-450 SD vehicles;
2005-2008 F-550 SD vehicles; 2004-2008 F-650 SD vehicles; and 2004-2008 F-750 SD
vehicles.

Ford now moves to dismiss Plaintiffs' SAC.  For the reasons set forth below, Ford's motion is GRANTED with respect to Plaintiffs' claims for common law fraud, fraud under the NJCFA, and breach of the implied warranty of merchantability, but DENIED with respect to Plaintiffs' claims for breach of express warranty and breach of the implied covenant of good faith and fair dealing.

## I.  BACKGROUND

On October 12, 2006, Coba Landscaping purchased a new 2006 Ford F-350 Super Duty 6.0L truck ("Vehicle 1").  On March 9, 2007, Mr. Coba and his landscaping business purchased a new 2006 Ford F-350 Super Duty 6.0L truck ("Vehicle 2").  Both vehicles suffered from significant problems with their fuel tanks.

### A.  Vehicle 1

On March 13, 2009, Mr. Coba brought Vehicle 1, which had 21,952 miles on its odometer, to an authorized Ford dealer, complaining that the fuel filter was contaminated with fuel tank material.  The dealer found rust in the fuel system and a lack of power in the engine.  Consequently, the fuel tank and fuel filter were replaced under warranty.

On December 30, 2012, at approximately 39,135 miles, Mr. Coba brought Vehicle 1 in to another Ford dealer, complaining that the vehicle would stall immediately upon ignition and not run.  The dealer found that the fuel filters were plugged with rust and that the fuel tank itself was heavily rusted.  Thus, the dealer replaced the fuel tank, fuel pump, and fuel injectors, and repaired the fuel lines at a cost of $2,177.52 because the vehicle was out of warranty.

### B.  Vehicle 2

On March 28, 2009, with approximately 24,824 miles on its odometer, Mr. Coba brought Vehicle 2 to a Ford dealer, complaining that the vehicle had no power and that the fuel filter was

contaminated with tank material.  The dealer agreed that the vehicle had no power and that the fuel tank was very rusted.  Both the fuel tank and fuel filter were replaced under warranty.

On April 14, 2009, with approximately 25,149 miles on its odometer, Mr. Coba brought Vehicle 2 to a Ford dealer, again complaining that the engine had no power.  The dealer agreed and replaced the fuel pump under warranty.

On November 2, 2009, at approximately 27,994 miles, Mr. Coba again took Vehicle 2 to a Ford dealer, complaining that it lost power when going up hills.  The dealer found rust and fuel tank liner debris in the fuel system, and replaced the fuel tank and fuel filter under warranty.

On February 24, 2011, at approximately 45,299 miles, Mr. Coba took Vehicle 2 to a Ford dealer for a third time, noting that (1) the fuel filter contained rust, (2) the engine was misfiring, and (3) the vehicle was inoperable.  The repair required a new fuel tank, which, at that time, was on a national backorder.  Therefore, the vehicle remained at the dealership until July 19, 2011, when the dealer received replacement fuel tanks.  In replacing Vehicle 2's tank, the dealer found rust in the fuel filter and that the fuel tank's coating had completely corroded.  The dealer flushed the fuel lines, replaced the fuel tank, fuel pump, and all eight fuel injectors at a cost of $2,056.69, as the vehicle was out of warranty.

## C.     The Fuel Tank Defect

According to Plaintiffs, the aforementioned vehicles, and the Class Vehicles as a whole, suffer from a common defect, termed the Fuel Tank Defect.  Specifically, "the inner lining of the fuel tank delaminates or flakes off and particles of coating or rust from the delaminated tank becomes lodged in the fuel lines, fuel filter, injection systems, or fuel pump, causing the fuel system to clog and become damaged."  (SAC ¶ 2.)  Moreover, because these vehicles contain "a

closed [fuel] system . . . the only way that debris can get into the fuel lines, fuel injectors or other parts of the fuel system is from the fuel tank."  (Id. ¶ 3.)

Consequently, "[w]hen the fuel system is clogged, the flow of fuel to the engine is restricted, and the engine loses power."  (Id.)  "This loss of power results in sudden stalling, bucking and kicking, loss of power, and loss of power steering."  (Id.)  According to Plaintiffs, the Fuel Tank Defect "presents a safety hazard" because the affected vehicles "are designed and marketed for towing heavy items and carrying heavy payloads," for which drivers "need to have maximum control to operate and drive these vehicles safely."[2]  (Id. ¶ 4.)

"Many Class Members attempted to remedy the problems caused by the Fuel Tank Defect through recommended repairs . . . including servicing or replacing the fuel lines, replacing the fuel filter, replacing the fuel injectors and/or replacing the fuel pump."  (Id. ¶ 78.) "Such services provided only temporary repair, often resulting in the repeat manifestation of problems caused by the Fuel Tank Defect and often outside the express warranty period, necessitating expensive repairs."  (Id.)

In addition, Class Members "replaced their vehicles' fuel tanks multiple times in an effort to remedy the problems cause by the Fuel Tank Defect."  (Id. ¶ 79.)  According to Plaintiffs, "Ford knew or should have known that these replacement fuel tanks were also defective and prone to delamination.  As such, replacing the fuel tank with another defective fuel tank also prone to delamination provided only a temporary repair, often times resulting in the replacement fuel tanks again delaminating and failing outside of the warranty period, necessitating expensive repairs."  (Id.)

---

[2] Plaintiffs note that Vehicle 1 "experienced a sudden stalling incident while traveling on the highway.  At the time, the truck was pulling a trailer laden with landscaping equipment." (SAC ¶ 61.)

5

**D.      Ford's Knowledge of the Fuel Tank Defect**

In July 2010, Tim Covert, a Ford engineer, made a PowerPoint presentation to the

American Society for Testing and Materials ("ASTM") entitled "Diesel Fuel Tank

Delamination/Corrosion and Fuel Information."[3]  The presentation states that "pre-coated steel

was used for diesel [fuel] tanks in the mid-1990s 'with no issues.'"  (SAC ¶ 8.)  It further states

that "Ford was aware that delamination issues 'began to increase with the introduction of

biodiesel' which occurred as early as 2001."  (Id.)  Then, according to the presentation, "a new

pre-coated steel for diesel fuel tanks was released in 2006 'to improve the biodiesel

compatibility' but that 'corrosion began to occur' with the introduction of Ultra Low Sulfur

Diesel."[4]  (Id.)

According to Plaintiffs, "Ford's knowledge of the Fuel Tank Defect is further evidenced

by two internal and non-public Special Service Messages ('SSMs') that Ford sent to its dealers

only."  (Id. ¶ 10.)  The first SSM, #19621, dated February 1, 2007, and entitled 1999-2008 F-

SUPER DUTY/2004-2007 E-SERIES – LACK OF POWER DUE TO LOW FUEL PRESSURE

– FUEL TANK LINER SEPARATION, states the following:

> SOME 1999-2008 F-SUPER DUTY 350 CHASSIS CABS 450/550, AND 2004-
> 2007 E-SERIES 350/450 VAN/WAGON (35GAL MID-SHIP TANK)
> VEHICLES WITH A DIESEL ENGINE, MAY EXHIBIT A LACK OF POWER
> CAUSED BY LOW FUEL PRESSURE.  IF NORMAL DIAGNOSTICS LEAD
> TO A RESTRICTED FUEL FILTER OR FUEL LINES, BE AWARE THAT
> FLAKING OR SEPARATION OF THE FUEL TANK LINER FROM THE

---

[3] According to Ford, this presentation is available in full at
http://www.astm.org/COMMIT/D02Presentations/covert.pdf.  However, this URL yields an error
message on the ASTM website stating: "File Not Found".  In addition, several Google searches
could not retrieve a copy of the presentation.  Therefore, the Court will rely only on the
allegations in the SAC with respect to the presentation.

[4] Ford also "represented to its dealers that it had released a new fuel tank . . . with 'greater
robustness' to bio-diesel fuels.  In fact, the new tanks were also defective and prone to
delamination and failure."  (SAC ¶ 74.)

STEEL FUEL TANKS MAY OCCUR DUE TO THE USE OF FUELS CONTAINING CONCENTRATIONS OF BIODIESEL GREATER THAN RECOMMENDED BY FORD (5%).   IF FLAKING/SEPARATION HAS OCCURRED, THE FUEL TANK WILL NEED TO BE REPLACED. ALTHOUGH FORD CONTINUES TO RECOMMEND/ALLOW A MAXIMUM BIO-DIESEL CONCENTRATION OF 5%, A NEW FUEL TANK HAS BEEN RELEASED WITH A GREATER ROBUSTNESS TO BIODIESEL[.][5]

(Lagrotteria Cert., Ex. 2.)  The second SSM, dated April 1, 2007, is entitled "'ENGINE AND ENGINE COOLING ENGINE DIESEL'": "'LACK OF POWER DUE TO LOW FUEL PRESSURE, FUEL TANK LINER SEPARATION [sic].'"  (SAC ¶ 12.)  "The April SSM identifies the same affected vehicles as identified in the February SSM[.]"  (Id.)

According to the SAC, while these SSMs "attribut[e] the defect to the use of certain biofuels . . . the Class Vehicles' fuel tanks delaminated regardless of the type of fuel used."  (Id. ¶ 15.)  In addition, "the new fuel tank released in 2006 . . . suffered the same defect as alleged herein, was equally defective, and did not prevent delamination."[6]  (Id.)

Moreover, the SAC quotes Greg Vice, a principal and service manager for a Ford franchise, as stating in an article posted on PRWeb dated April 16, 2012, that the his dealership has observed the Fuel Tank Defect for over twelve years, and that it "had no choice but to replace one steel tank with another steel tank destined to fail."  (Id. ¶ 17.)  Other Ford dealers "also admitted to customers that the fuel tanks were delaminating, further confirming that Ford was well aware of the Fuel Tank Defect."  (Id. ¶ 18.)  There were also "a plethora of consumer complaints on the internet and catalogued by NHTSA."  (Id. ¶ 19.)  Many of these complaints are set forth in ¶¶ 75 and 76 of the SAC.

---

[5] The SSM was reproduced as a bulletin later in February 2007 by the National Highway Traffic Safety Administration.

[6] Ultimately, "[i]n response to the widespread nature of the Fuel Tank Defect, after-market manufacturers produced a polyethylene fuel tank using a new polymer tank that was impervious to corrosion."  (SAC ¶ 17.)

**E.**     **Ford's Warranty**

The Class Vehicles are subject to the terms and conditions of the 2006 New Vehicle

Limited Warranty.  Under the warranty's Bumper to Bumper Coverage, which lasts for three

years or 36,000 miles, "authorized Ford Motor Company dealers will repair, replace, or adjust all

parts of your vehicle that are defective in factory-supplied materials or workmanship."

(Lagrotteria Cert., Ex. 1.)  The Fuel Tank Defect in Plaintiffs' vehicles was repaired pursuant to

Bumper to Bumper Coverage.

The warranty also contains 6.0L PowerStroke Diesel Engine Coverage for "the direct

injection diesel engine and engine components against defects in factory-supplied materials or

workmanship for five years . . . or 100,000 miles."  (Id.)  However, the fuel lines and fuel tank

are expressly excluded from coverage.  (Id.)

## II.     DISCUSSION

Ford now moves to dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure

12(b)(6).  With respect to Plaintiffs' claim for breach of express warranty, Ford argues that (1) it

did not breach the terms of the New Vehicle Limited Warranty; (2) the limitations of the New

Vehicle Limited Warranty are not unconscionable; and (3) any breach of express warranty claim

not based on the New Vehicle Limited Warranty should be dismissed.

With respect to Plaintiffs' NJCFA and common law fraud claims, Ford argues that (1) it

had no obligation to disclose specific defects that may or may not occur after the warranty

period; (2) Plaintiffs fail to allege that Ford knew with certainty that all or substantially of the

fuel tanks in the Class Vehicles would fail; (3) Plaintiffs' safety allegations fail and are otherwise

barred in this case by the New Jersey Products Liability Act; and (4) Plaintiffs fail to identify any

specific misrepresentations.

As to Plaintiffs' claim for breach of the implied warranty of merchantability, Ford argues that (1) that claim is barred by the statute of limitations; and (2) Plaintiffs' vehicles were merchantable as a matter of law.  Finally, Ford argues that Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing seeks to unlawfully rewrite the terms of the New Vehicle Limited Warranty.

**A.     Standard of Review**

In assessing the parties' arguments, the Court must apply the standard of review applicable to requests for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6).  That rule permits a court to dismiss a complaint for failure to state a claim upon which relief can be granted.  When considering a Rule 12(b)(6) motion, the Court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  The Court's inquiry, however, "is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims."  In re Rockefeller Ctr. Prop., Inc., 311 F.3d 198, 215 (3d Cir. 2002).

The Supreme Court recently clarified the Rule 12(b)(6) standard in two cases:  Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), and Bell Atlantic Corporation v. Twombly, 550 U.S. 544 (2007).  The decisions in those cases abrogated the rule established in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief."  In contrast, Bell Atlantic, 550 U.S. at 545, held that "[f]actual allegations must be enough to raise a right to relief above the speculative level."  Thus, the assertions in the complaint must be enough to "state a claim to relief that is plausible on its

face," id. at 570, meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the conduct alleged."  Iqbal, 129 S. Ct. at 1949; see also, Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) (In order to survive a motion to dismiss, the factual allegations in a complaint must "raise a reasonable expectation that discovery will reveal evidence of the necessary element," thereby justifying the advancement of "the case beyond the pleadings to the next stage of litigation.").

When assessing the sufficiency of a complaint, the Court must distinguish factual contentions – which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted – from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  Iqbal, 129 S. Ct. at 1949.  Although for the purposes of a motion to dismiss the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  Id.

## B.      Breach of Express Warranty

"A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty."  Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 525 (1992).  The "general rule," stated by the Court of Appeals in Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 616 (3d Cir.1995) (citations and quotations omitted), is "that an express warranty does not cover repairs made after the applicable time has elapsed." That rule applies regardless of whether the defect existed prior to the expiration of the warranty. Id.

Ford argues that it satisfied the terms of the New Vehicle Limited Warranty because it replaced all parts that were affected by the Fuel Tank Defect, at no cost to the consumer, until Bumper to Bumper coverage elapsed.  Plaintiffs counter that Ford failed to satisfy the terms of the warranty because Ford used replacement parts that were equally defective, thereby failing to actually remedy the original defect.

Here, the SAC alleges that Ford replaced Plaintiffs' fuel tanks with new fuel tanks that were similarly prone to delamination, thus perpetuating the Fuel Tank Defect out of the warranty period and ultimately leaving Plaintiffs to pay for relevant repairs and replacement parts.  This is a clear failure to "repair, replace, or adjust all parts of your vehicle that are defective in factory-supplied materials or workmanship" under the New Vehicle Limited Warranty.  (Lagrotteria Cert., Ex. 1.)  To allow Ford to satisfy the warranty by replacing one defective part with another equally defective part would render it meaningless.

Ford further argues Plaintiffs' breach of express warranty claim must fail because the alleged Fuel Tank Defect is a design defect, while the New Vehicle Limited Warranty covers only defects in materials or workmanship.  In doing so, Ford likens this case to Brothers v. Hewlett-Packard Co., No. C-06-02254, 2007 WL 485979 (N.D.Cal. Feb. 12, 2007).  In that case, the plaintiffs purchased a laptop computer containing a motherboard with a certain type of graphics card that caused the machine to overheat and experience "graphics distortion." Brothers, 2007 WL 485979, at *1.  Consequently, the manufacturer replaced the plaintiffs' computers with the same motherboard and graphics card, which ultimately failed again in the same manner.  Id.

The computers were subject to a one-year warranty stating that the "hardware product and all internal components of the product . . . are free from defects in material and workmanship

under normal use," and that the manufacturer "will repair or replace the defective component

parts or hardware products." Id. at *2.  Thus, the plaintiffs sued the manufacturer for breach of

express warranty, alleging that the "there was no 'repair' since" the manufacturer merely

replaced "a defective part with another defective part." Id. at *4.

The court found that "replacement or repair of malfunctioning components during the life

of the warranty is exactly what the Limited Warranty provides." Id.  The court further noted that

"the Limited Warranty does not guarantee against design defects, it guarantees against defects in

material and workmanship." Id.  "Unlike defects in materials or workmanship, a design defect is

manufactured in accordance with the product's intended specifications." Id. (citation and

emphasis omitted).

Here, however, it is unclear whether the Fuel Tank Defect is a design defect or a defect in

materials or workmanship, and the Court need not resolve the issue at the pleading stage.

Indeed, "[a]t the pleading stage, where the distinction between a defect in design and defect in

materials or workmanship is a matter of semantics, and sufficient facts are alleged to assert both,

the defendant's characterization of the nature of the claim pre-discovery should not control

whether the complaint survives." Alin v. Am. Honda Motor Co., No. 08-4825, 2010 WL

1372308, at *6 (D.N.J. Mar. 31, 2010)

In Alin, the plaintiffs alleged a defect in the air conditioning system of certain Honda

Automobiles. Id. at *1.  Specifically, they alleged that "the condenser is manufactured out of

materials that cannot withstand the force of impact of rocks, pebbles, and other small road debris

that every vehicle encounters under normal driving conditions."  Id. at *4.  "As a result, the

condensers are easily damaged, which causes the A/C system to malfunction and results in costly

repairs."  Id.  This Court found that this defect could be either a design defect or defect in

12

materials or workmanship because Honda had failed to demonstrate that the alleged defect had no relation to materials or workmanship.  Id. at *6.

Like the air conditioning defect alleged in Alin, the Fuel Tank Defect in this case— whereby "the inner lining of the fuel tank delaminates or flakes off and particles of coating or rust from the delaminated tank becomes lodged in the fuel lines, fuel filter, injection systems, or fuel pump, causing the fuel system to clog and become damaged" (SAC ¶ 2)—could relate to either a design defect or a defect in materials and workmanship.  Indeed, Ford has failed to demonstrate that the Fuel Tank Defect has no relation to a defect in materials and workmanship.  Consequently, Plaintiffs' claim for breach of express warranty may move forward at this time.

## C.     Breach of the Implied Covenant of Good Faith and Fair Dealing

"[E]very contract in New Jersey contains an implied covenant of good faith and fair dealing [,t]hat is, neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract[.]"  Wood v. New Jersey Mfrs. Ins. Co., 206 N.J. 562, 577 (2011) (quotations and citations omitted).  Plaintiffs set forth a claim for breach of the implied warranty of good faith and fair dealing under the New Vehicle Limited Warranty based on Ford's "repairing Plaintiffs' and other Class Members' vehicles, purportedly under the warranty, knowing that those repairs and replacements would not fix or remedy the fuel tank defect."  (SAC ¶ 132.)  These illusory repairs "included cleaning and flushing the fuel lines, cleaning and replacing the fuel filters, replacing the fuel injectors, replacing the fuel pump[,] and replacing the fuel tank" with an equally defective fuel tank.  (Id.)

Ford argues that this claim attempts to rewrite the terms of the New Vehicle Limited Warranty to allow repairs beyond the duration of the warranty.  Plaintiffs counter that its claim does no such thing and instead is aimed at Ford's knowledge of the Fuel Tank Defect and

execution of the repairs to Plaintiffs' and Class Members' vehicles in a manner that deprived them of the warranty's benefits.

Plaintiffs' arguments are persuasive.  The SAC sets forth a number of allegations tending to show that, by 2009, when Plaintiffs first brought their vehicles in for repair as a result of the Fuel Tank Defect, Ford knew that the repairs it offered for the Fuel Tank Defect within the warranty period were illusory.  Specifically, the allegations regarding Mr. Covert's 2010 presentation creates a reasonable inference that, by 2009, Ford was acutely aware of (1) the Fuel Tank Defect; and (2) the persistent nature of the defect despite Ford's attempts to introduce a fuel tank that would not delaminate.  Further supporting such an inference are the SSM reports that Ford issued to dealers in 2007 detailing the nature of the Fuel Tank Defect[7], and Greg Vice's public statement that his Ford dealership franchise had observed the Fuel Tank Defect for over twelve years, and that it "had no choice but to replace one steel tank with another steel tank destined to fail."  (Id. ¶ 17.)

In short, Plaintiffs set forth sufficient allegations to create a reasonable inference that, in repairing Vehicle 1 and Vehicle 2 under the New Vehicle Limited Warranty for issues caused by the Fuel Tank Defect, Ford knew that it would be unable to remedy the defect, thus depriving Plaintiffs of the benefits of their warranty coverage.  Consequently, Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing may move forward at this time.

**D.     NJCFA and Common Law Fraud**

---

[7] To be sure, the SSM reports note that delamination occurs when consumers introduce fuel with biodiesel concentrations that are greater than those recommended by Ford.  However, the SAC clearly states that "the Class Vehicles' fuel tanks delaminated regardless of the type of fuel used."  (Id. ¶ 15.)  Moreover, Ford makes no mention of consumers' failure to use appropriate fuel in its motion papers.

The parties discuss Plaintiffs' fraud claims under the NJCFA and common law in tandem. Thus, the Court will, too.  Federal Rule of Civil Procedure Rule 9(b) sets forth a heightened pleading standard for allegations of fraud, including those serving to support a claim under the NJCFA.  Federico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007).  Under that standard, a plaintiff must "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged."  Id.

Specifically, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of [ ] fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276–77 (3d Cir. 2006) (quoting In re Burlington Coat Factory, 114 F.3d at 1422).  Thus, to allege a claim under the NJCFA, "Rule 9(b) requires a plaintiff to plead (1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff suffered an ascertainable loss as a result of the misrepresentation."[8]  In re Rockefeller Ctr. Props. Inc. Secs. Litig., 311 F.3d 198, 216 (3d Cir. 2002).

Plaintiffs allege that Ford "knew about the Fuel Tank Defect at the time of sale and of repair" of the Class Vehicles, and that, despite this knowledge, "omitted any mention of the Fuel Tank Defect from advertising, marketing materials, vehicle pamphlets, Ford's website, sales

---

[8] Unlike common law fraud, the NJCFA does not require Plaintiffs to prove that they actually relied on Ford's misrepresentations or omissions.  N.J.S.A. 56:8–2 (allowing recovery "whether or not any person has in fact been misled, deceived or damaged" by the defendant's misrepresentation or omission); Int'l Union of Operating Eng'rs Local # 68 Welfare Fund v. Merck & Co., 192 N.J. 372, 391 (N.J. 2007) ("Our CFA does not require proof that a consumer has actually relied on a prohibited act in order to recover."); see also In re Mercedes–Benz Tele Aid Contract Litig., 257 F.R.D. 46, 73–74 (D.N.J. 2009) (discussing the difference between reliance and ascertainable loss).

materials, and other means that would have apprised Plaintiffs and Class Members of the Fuel

Tank Defect." (SAC ¶¶ 142, 143.)  Ford also omitted any mention of the Fuel Tank Defect at the

time it repaired the Class Vehicles. [9]

Plaintiffs further allege that Ford knowingly and intentionally failed to disclose the Fuel

Tank Defect "in order to secure the sale of [the Class Vehicles] at a premium price and also to

mislead owners during the express warranty period to avoid having to perform their contractual

duties under the warranty." (Id. ¶ 147.)  Moreover, according to Plaintiffs, the Fuel Tank Defect

"was not known or knowable to a significant number of" Class Vehicle customers, and that,

"[e]ven if the Fuel Tank Defect was knowable . . . [a] defective fuel tank is not the type of defect

subject to a 'trade off.'  Without a working fuel tank, a vehicle will not run." (Id. ¶ 152.)

Finally, Plaintiffs allege that they and Class members suffered an ascertainable loss by having to

pay for costly fuel tank repairs out of pocket and therefore "receiv[ed] less than what was

promised." (Id. ¶ 153.)

Ford argues that (1) Plaintiffs cannot show that Ford omitted the Fuel Tank Defect

because the New Vehicle Limited Warranty acknowledges the possibility of defects in the Class

Vehicles; (2) Plaintiffs fail to allege that Ford knew that the fuel tanks in the Class Vehicles

would fail; and (3) Plaintiffs' safety allegations are speculative and are otherwise barred by the

New Jersey Products Liability Act.

The notion that a manufacturer would be absolved from liability for knowingly omitting a

defect because it acknowledges the possibility of defects in its warranty is both illogical and

---

[9] Plaintiffs also allege that Ford "falsely represented to Class Vehicle Owners that the problems they experienced with the Class Vehicles were caused by outside influences, including, for example, the use of biodiesel, biodiesel blends and/or Ultra Low Sulfur Diesel when, in fact, the Fuel Tank Defect was the source of those problems." (Id. ¶¶ 145, 146.)  To the extent this allegation intends to set forth an NJCFA claim based on an affirmative misrepresentation, it fails to satisfy the specificity requirements of Rule 9(b) and therefore must be dismissed.  Moreover, Plaintiffs fail to discuss any affirmative misrepresentation claim in their brief.

contrary to the spirit of the NJCFA.  Indeed, this Court recently held that "[w]arranty coverage of a particular problem does not, as a matter of law, negate a [NJ]CFA claim that the manufacturer knowingly omitted information about a . . . defect."  Mickens v. Ford Motor Co., Civ. No. 2:10–5842, 2012 WL 4659888, at *11 (D.N.J. Oct. 1, 2012).  The Court explained:

> [A]dopting Ford's position that the mention in a warranty of a potential defect negates any claim of a knowing omission under the [NJ]CFA would undermine the statute's strong remedial purpose. . . .  It is, at least, a bit odd to treat a warranty against the occurrence of a defect as a disclosure to the consumer that the defect can or will occur.  Indeed, many consumers might interpret such a warranty as an assurance that the defect is *not* likely to occur.  In advertisements, manufacturers often boast of their ironclad warranties and present them to the consumer as emblems of product quality and reliability.  Moreover, Ford's interpretation would create a perverse incentive.  Manufacturers would insert into warranties long lists of potential defects, and thereby—in the guise of reassuring consumers that they are covered against all eventualities—protect themselves, even from claims that they had actual knowledge of a material defect and concealed it, intending that consumers rely.

Id. at *12.

On the other hand, Ford's argument that Plaintiffs fail to allege that Ford knew that Plaintiffs' vehicles suffered from the Fuel Tank Defect is persuasive.  While Plaintiffs' allegations regarding Tim Covert's 2010 presentation, the SSMs, and Greg Vice's statement allow for a reasonable inference that Ford knew that it had no good way to repair Class Vehicles suffering from the Fuel Tank Defect in 2009, those allegations do not suggest that Ford knew, at the time of sale, that the Fuel Tank Defect would manifest in Plaintiffs' vehicles.[10]

---

[10] Plaintiffs may only base their fraud claims on Ford's knowledge of the Fuel Tank Defect at the time they purchased their vehicles, not at the time Ford repaired them.  See Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co., 226 F. Supp. 2d 557, 563 (D.N.J. 2002) (noting that fraud claims between parties to a contract must be fraud in the inducement of the contract, as opposed to fraud in the performance of the contract).  Thus, to the extent Plaintiffs allege a fraud claim based on Ford's failure to adequately repair the Fuel Tank Defect under the New Vehicle Limited Warranty, such a claim is duplicative of Plaintiffs' breach of express warranty claim.

Mr. Covert's presentation states that Ford (1) began to see delamination issues as early as 2001 with the introduction of biodiesel fuel; (2) attempted to remedy those issues by introducing a new type of pre-coated steel for diesel fuel tanks in 2006; and (3) began to see delamination of its new tank with the introduction of Ultra Low Sulfur Diesel fuel.[11]  This does not suggest that Ford knew that, at the time Plaintiffs purchased Vehicle 1 (October 12, 2006) or Vehicle 2 (March 9, 2007), those vehicles' fuel tanks were prone to delamination because it is entirely unclear whether the vehicles contained the pre-2006 fuel tank (the "Old Tank") or the newer fuel tank that ford introduced in 2006 (the "New Tank").  If Plaintiffs' vehicles contained the Old Tank, one could indeed infer that Ford knew at the time of sale that the vehicles suffered from the Fuel Tank Defect because Mr. Covert's presentation makes clear that, by 2006 or 2007—when Plaintiffs purchased their vehicles and around the time Ford introduced the New Tank—Ford knew that the Old Tank was prone to delamination.  If, on the other hand, the vehicles contained the New Tank that Ford introduced to alleviate the delamination issues with the Old Tank, one could not make such an inference because the presentation does not indicate when Ford became aware that the New Tank also suffered from delamination.  Without this information, it is impossible to ascertain whether Ford knew that the New Tank was prone to delamination at the time Plaintiffs' vehicles were sold.[12]

---

[11] To be sure, Plaintiffs allege that both fuel tanks experienced delamination no matter what type of fuel was used, but they do not allege that Ford had such knowledge.

[12] To be sure, whether Plaintiffs' vehicles contained the Old Tank or New Tank does not affect the aforementioned issue (with respect to Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing) of whether Ford knew that it could not repair the Fuel Tank Defect in 2009, when Plaintiffs brought their vehicles in for repair.  As previously discussed, the SAC sets forth allegations tending to show that, by that time, Ford was aware of the persistent nature of the Fuel Tank Defect, even in the face of the New Tank.  In other words, by that time, one may plausibly infer that Ford knew that the Fuel Tank Defect afflicted both the Old Tank and the New Tank.

The SSMs present a similar issue.  While they confirm that, as of February 2007, Ford was aware of the Fuel Tank Defect with respect to the Old Tank, they do not indicate that Ford knew of the defect regarding the New Tank.  Indeed, the SSMs suggest that Ford believed that the New Tank would alleviate the Fuel Tank Defect because it had "a greater robustness to bio-diesel."  (SAC ¶ 14.)  Finally, the dealer admissions and consumer complaints regarding the Fuel Tank Defect may indicate general awareness of the Fuel Tank Defect, but shed no light on whether Ford had knowledge of the defect at the time Plaintiffs' vehicles were sold.

Plaintiffs contend that their allegations of Ford's knowledge of the Fuel Tank Defect are similar to those that sustained an NJCFA claim in <u>Mickens</u>.  In <u>Mickens</u>, the plaintiff alleged that the hoods of a number of Ford vehicles suffered from a defect that resulted from constructing the hood panel out of aluminum and supporting parts out of iron, without providing an adequate barrier between the two materials.  2012 WL 4659888, at *2.  This combination of aluminum and iron "caused all of the vehicles at issue to suffer from galvanic corrosion, a process that occurs in the presence of electricity whereby a metal with a more active electrode potential gives up its electrons to the less active metal."  <u>Id.</u>  "Because aluminum is more active than iron, an aluminum hood connected to iron in the presence of an electrical current would experience galvanic corrosion."  <u>Id.</u>  "The galvanic corrosion led to the vehicles suffering a premature loss of structural integrity . . . [that was] constant across all environments and conditions and is not subject to individual variables such as environment or driver operation."  <u>Id.</u>

The court found that these allegations were sufficient to suggest that Ford "had to know that galvanic corrosion would occur based upon commonly known scientific principles, as well as Ford's prior experience with galvanic corrosion, its participation in numerous studies, and its access to extensive technical and scientific information relating to galvanic corrosion to inform

its vehicle design decisions, including its choice of materials."  Id. at *14.  Here, however, Plaintiffs provide no allegations regarding the scientific process by which the subject fuel tanks delaminate, or that Ford had certain knowledge of this process.

To be sure, the SAC makes clear that Ford had knowledge that many of the Class Vehicles suffered from the Fuel Tank Defect.  However, without alleging the process by which the Fuel Tank Defect manifests, it is impossible to reasonably infer that Ford knew that, at the time Plaintiff' purchased their vehicles, the Fuel Tank Defect would manifest in them.[13]

Finally, the parties vigorously dispute whether the requirement that a plaintiff show a knowing omission of material fact is excused in the face of safety allegations.  In doing so, they cite to the following language in Perkins v. DaimlerChrystler Corp.: "[A]bsent those circumstances in which safety concerns might be implicated, as to which we offer no view—the failure of a manufacturer or seller to advise a purchaser that a part of a vehicle may breakdown or require repair after the expiration of the warranty period cannot constitute a violation of the [NJ]CFA."  383 N.J. Super. 99, 111-112 (App. Div. 2006).  However, this language concerns not the knowledge element of an NJCFA claim, but rather the ascertainable loss element, as it clearly speaks to "the determination about ascertainable loss in the present matter" as an extension of the New Jersey Supreme Court's ruling in Thiedemann v. Mercedes-Benz USA, LLC, 183 N.J. 234 (2005).  Id. at 111 ("As the Court said in Thiedemann, [t]he defects that arise and are addressed by warranty, at no cost to the consumer, do not provide the predicate loss that the [NJ]CFA expressly requires for a private claim under the [NJ]CFA, bringing with it the potential for treble damages, attorney's fees, and the court costs and fees.  Similarly, a claim that a defect may, but

---

[13] In fact, Ford's failed attempt to introduce a more robust diesel fuel tank suggests that Ford did not have a sufficient understanding of the process by which the Class Vehicles' fuel tanks were delaminating.

has not, manifested itself until after the expiration of the warranty period cannot form the basis for a claim under the CFA." (quotations omitted)).

Moreover, it is unclear what logical bearing safety allegations would have on the knowledge element of a fraud claim, and Plaintiffs present no reason why such allegations should satisfy that element.  Therefore, Plaintiffs' NJCFA and common law fraud claims are dismissed.  However, the Court will grant Plaintiffs leave to amend their omissions claims[14], if they can, to set forth allegations indicating whether Vehicle 1 and Vehicle 2, at their time of sale, contained the Old Tank, or the New Tank.  To the extent either or both vehicles contained the New Tank, Plaintiffs must allege when Ford became aware of delamination issues with that tank.

**E.      Implied Warranty of Merchantability**

Ford argues that the Court should dismiss Plaintiffs' claim for breach of the implied warranty of merchantability because (1) that claim is barred by the statute of limitations; and (2) Plaintiffs' vehicles were merchantable as a matter of law.  Plaintiffs argue that (1) Ford fraudulently concealed the Fuel Tank Defect; and (2) the Fuel Tank Defect rendered their vehicles unfit for their ordinary purpose.

Under New Jersey Law, Plaintiffs' claim for breach of the implied warranty of merchantability is subject to a four-year statute of limitations.  See Dewey v. Volkswagen AG, 558 F. Supp. 2d 505, 523 (D.N.J. 2008) ("[I]mplied warranty claims are governed either by the four-year statute of limitations found in UCC § 2–725 or that section's tolling provision."). Under N.J.S.A. 12A:2-725(2), "[a] cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender

---

[14] While allowing Plaintiffs to amend their allegations at this time would result in a Third Amended Complaint, their fraud allegations come close to surviving Ford's Motion to Dismiss. Moreover, it is troubling that Ford expressly excluded the fuel tank and fuel lines from 6.0L PowerStroke Diesel Engine Coverage.

of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."  Here, Plaintiffs' claim for breach of the implied warranty of merchantability accrues at the time they purchased their vehicles because "[i]mplied warranties, by their very nature, cannot extend to future performance because such an extension must be *explicit* and an implied warranty cannot explicitly state anything." Travelers Indem. Co. v. Dammann & Co., Inc., 592 F. Supp. 2d 752, 765 (D.N.J. 2008) (citation omitted).

As previously discussed, Plaintiffs purchased their vehicles on October 12, 2006 and March 9, 2007, but only asserted their claim for breach of the implied warranty of merchantability in their initial complaint on March 14, 2012—more than four years from either date of purchase.  Thus, Plaintiffs' claim for breach of the implied warranty of merchantability is barred by the statute of limitations.

Plaintiffs' argument that the four-year statute of limitations should be tolled in this case because Ford fraudulently concealed the Fuel Tank Defect is unavailing.  Plaintiffs point to no instances of active concealment of the Fuel Tank Defect in the SAC or their brief.  To the extent Plaintiffs' allegations of fraudulent concealment are "based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a 'special relationship.'"  Lightning Lube, Inc. v. Whitco Corp., 4. F.3d 1153, 1185 (3d Cir. 1993) (citations omitted).  Plaintiffs do not identify any specific ambiguous partial disclosures or statements by Ford.  Thus, the Court must determine whether there is a special relationship between Plaintiffs and Ford that would impose a duty to disclose.

"Three categories of relationships give rise to a duty to disclose: (1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties." Id. (citation omitted).  New Jersey Courts have found no special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose on the manufacturers.  See Harvey v. Nissan North Am., Inc., No. C-12016-04, 2005 WL 1252341, at *4 (Ch. Div. Apr. 29, 2005) (finding no fiduciary or special relationship between automobile manufacturer and individual consumer that purchased vehicle from authorized dealership); Green v. G.M.C., 2003 WL 21730592, at *8 (July 10, 2003) (same).  Plaintiffs provide no reason why the Court should find otherwise.  Consequently, Plaintiffs' claim for breach of the implied warranty of merchantability is dismissed with prejudice.

### III.  CONCLUSION

For the foregoing reasons, Ford's Motion to Dismiss is GRANTED with respect to Plaintiffs' claims for common law fraud, fraud under the NJCFA, and breach of the implied warranty of merchantability, but DENIED with respect to Plaintiffs' claims for breach of express warranty and breach of the implied covenant of good faith and fair dealing.  Plaintiffs' claim for breach of the implied warranty of merchantability is dismissed with prejudice.  Plaintiffs' claims for common law fraud and fraud under the NJCFA are dismissed without prejudice and with leave to amend.

The Court will enter an order implementing this opinion.

23

   **_/s/ Dickinson R. Debevoise_____**
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: January 22, 2013