# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **GALO COBA and COBA LANDSCAPING AND CONSTRUCTION, INC., individually, and on behalf of other members of the general public similarly situated,** | Civ. No. 12-1622 (KM) (MAH) |
| **Plaintiffs,** | **OPINION** |
| **v.** | |
| **FORD MOTOR COMPANY,** | |
| **Defendant.** | |

## KEVIN MCNULTY, U.S.D.J.:

Plaintiffs Galo Coba and Coba Landscaping and Construction, Inc. ("Coba Landscaping")[1] bring this putative class action against Defendant Ford Motor Company ("Ford"). The Third Amended Class Action Complaint (the "Complaint") (ECF no. 91)[2] contains four counts arising out of Ford's alleged inability to cure a defective fuel tank installed in certain Ford F–Series Super Duty trucks and E–Series vans. Counts 1 and 2 allege breach of express

---

[1] Plaintiffs will be generally be referred to collectively as "Coba," unless otherwise specified.

[2] Certain record items, cited repeatedly, will be abbreviated as follows:

> 3AC = Third Amended Class Action Complaint (ECF no. 91)
>
> SMF = Defendant's Statement of Material Facts (ECF no. 130-1)
>
> RSMF = Plaintiff's Response to Ford's Statement of Material Facts (ECF no. 130-7)
>
> Pl. Opp. = Coba's Opposition (ECF no. 130-7)
>
> Zohdy Decl., Ex. = Declaration of Tarek H. Zohdy (ECF no. 130-8 through 130-13)

warranty and breach of the implied contractual covenant of good faith and fair dealing. Counts 3 and 4 allege a violation of the New Jersey Consumer Fraud Act (the "CFA"), N.J. Stat. Ann. § 56:8–2, and common law fraud. Now before the Court is Ford's motion (ECF no. 130-1) for summary judgment.

For the reasons set forth below, the evidence fails to raise any material issue of fact as to the viability of Coba's claims, and I grant summary judgment to Ford on Counts 1, 2, and 4, and I administratively terminate without prejudice the portion of Ford's summary concerning Count 3 and grant leave to submit supplemental briefing.

## I.   BACKGROUND
### A. Coba's Truck Purchases and Fuel System Problems

On October 12, 2006, Mr. Coba purchased a new 2006 Ford F-350 Super Duty 6.0L diesel truck. (SMF ¶ 7) On March 9, 2007, Coba and Coba Landscaping purchased another new 2006 F-350 Super Duty 6.0L diesel truck. (SMF ¶ 4) (I will refer to these as Coba's "first truck" and "second truck.") Both vehicles came with Ford's New Vehicle Limited Warranty ("NVLW"). (RSMF ¶ 15) Around the time of purchase, Coba was provided with a Warranty Guide specifying the terms of the NVLW (*id.*), and he "browsed through it" after purchasing the first truck (SMF ¶ 16).

The NVLW includes 3-year/36,000-mile bumper to bumper coverage, and 5-year/100,000-mile coverage for the 6.0L PowerStroke Diesel Engine. (SMF ¶ 17) The Warranty Guide states that

> Bumper to Bumper Coverage begins at the warranty start date and lasts for three years or 36,000 miles, whichever occurs first. During this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship. Items or conditions that are not covered by the New Vehicle Limited Warranty are described on pages 7-9.

(SMF ¶ 18) The fuel tank is listed as being covered under the bumper to bumper warranty. (RSMF ¶ 22)

2

Both the bumper to bumper warranty and the 6.0L PowerStroke Diesel Engine warranty exclude coverage for damage caused by "improper fuels." (SMF ¶ 25) The NVLW has excluded coverage for damage caused by improper fuels since 1995. Beginning with the 2005 Model Year, the Warranty and Policy Manuals for the F-350 Super Duty 6.0L diesel truck state, "If the use of a fuel that is not recommended by Ford is found to be the cause of a malfunction or damage to a covered diesel engine component, then the repair is not covered under warranty." (RSMF ¶ 26)

Around the time of each truck purchase, Coba also received a copy of the F-Series Super Duty 2006 Owner's Guide and a copy of the PowerStroke 6.0 Liter Direct Injection Turbo Diesel Owner's Guide Supplement ("Diesel Owner's Guide"). (RSMF ¶¶ 28-29) The Diesel Owner's Guide contains instructions regarding the proper diesel fuel, and instructs that "Diesel Fuel containing no more than 5% of biodiesel may be used."[3] (SMF ¶ 30) The Diesel Owner's Guide further states: "Diesel fuel that meets the World-wide Fuel Charter should be used when available. Ask your fuel supplier about fuel that meets the World-wide Fuel Charter." (SMF ¶ 31)

Nearly two and a half years and 21,952 miles after its purchase, Coba's first truck began to experience fuel system trouble. On March 13, 2009, Coba took it to a Ford dealership, complaining that the fuel filter was contaminated. The vehicle was still within warranty; the dealership replaced the fuel tank and fuel filters at no cost to Coba (SMF ¶ 49) On January 20, 2011, nearly five years and 39,135 miles after its purchase, Coba brought the first truck into the Route 23 Auto Mall dealership, complaining that the truck would start "for a minute" and then just stop. The dealership replaced the fuel tank and fuel pump. The vehicle was out of warranty, and Coba paid $2,177.52 not covered by Coba's extended service plan. (RSMF ¶ 50)

---

[3]     Coba notes that "Ford only added this instruction to the Diesel Owner's Guide beginning in 2004." (RSMF at ¶ 30)

Coba's second truck experienced similar problems. On March 28, 2009, just over two years and 24,824 miles after its purchase, the truck had no power. Coba took the truck to a Ford dealership. The truck was still within warranty, and the dealership replaced the fuel tank and fuel filters at no cost to Coba. (SMF ¶ 51) Later in 2009, on November 2, Coba returned to the dealership complaining of a lack of power when going up hills. The dealership technician verified the concern and "found rust and fuel tank liner debris." The vehicle was still under warranty and the dealership again replaced the fuel tank and fuel filters at no cost to Coba. (SMF ¶ 52) This was not the end of Coba's troubles with the second truck. On February 24, 2011, nearly four years and 45,300 miles after purchase, Coba took the truck to Route 23 Auto Mall, complaining that the engine "lacked power and would 'miss' when driving." The dealership informed Coba that "the fuel tank needed to be replaced, but that the replacement fuel tank was on backorder." The dealership replaced the tank on July 19, 2011. The truck was out of warranty, and Coba paid the $2,058.69 of the repair costs not covered by Coba's extended service plan. (RSMF ¶¶ 53-54)

On March 14, 2012, Coba filed this lawsuit based on the fuel tank problems Coba experienced with the first and second trucks. (SMF ¶ 55) The two 2011 replacement tanks partially paid for under extended service plans, however, seem to have solved the problem; Coba does not allege that they have delaminated, although Coba alleges that they are prone to delaminating. (Pl. Opp. at 14)

## B. History of Steel Fuel Tank Delamination on Ford Vehicles Before Coba's Truck Purchases

Certain F-Series and E-Series Ford vehicles—including Coba's—were equipped with steel fuel tanks internally lined with an epoxy-based coating manufactured by Magni Industries, Inc. ("Magni"). (SMF ¶ 62) From the mid-1990's to model year 2006, this coating was designated "A31." (*Id.*) In response to new federal environmental regulations that mandated the removal of

4

hexavalent chrome from automotive components, Magni developed a new coating designated "A36." (SMF ¶¶ 67-68) The A31 and A36 coatings were compositionally "very similar," differing only in that A36 was chrome-free. (SMF ¶ 69) Beginning with model year 2006, Ford applied A36 instead of A31 to the steel fuel tanks in certain Ford vehicles, including F-350 Super Duty chassis cab trucks. (SMF ¶ 86)

Both the A31 and A36 coatings passed Magni's corrosion and fuel resistance testing.[4] (RSMF ¶¶ 63, 70) The testing included measurement of A36's resistance to "an aggressive blend of gasoline that contained acetic or formic acid." (SMF ¶ 71) From 2002-2004 Ford also participated in a study of fuel tank corrosion durability conducted by the Strategic Alliance for Steel Fuel Tanks ("SASFT"). That SASFT testing used "an aggressive gasoline and ethanol blend containing acetic acid" and "showed that A36-lined steel fuel tanks would resist internal and external corrosion for up to 20 years." That testing did not, however, include diesel fuel. (RSMF ¶ 73)

The A31 coating had performed without any reported problems from 1993 until 2001. (SMF ¶ 66) In 2001, however, Ford received reports from Brazil that several A31-coated fuel tanks in Ford vehicles had delaminated. Delamination refers to particles of the epoxy-based tank lining becoming separated from the zinc-nickel coated steel. These particles can clog the fuel delivery system, choke the flow of fuel to the engine, and cause problems such as lack of power. (SMF ¶ 64)

Magni tested the tanks from Brazil in an attempt to determine the cause of delamination, and reported its findings on October 17, 2001. (SMF ¶ 65) The report noted:

> Epoxy based coatings such as A31 exhibit very good chemical resistance. However, this coating can be destroyed completely with

---

[4]   However, Coba and Ford dispute the comprehensiveness of Magni's testing. Coba asserts that Magni's testing was not extensive because it failed to test A31 for resistance to biodiesel or to test A36 for resistance to "ULSD or the fuels generally available on the market." (RSMF 63, 70-71)

> a high concentration of strong acids or alkalis. This A31 coating
> has been subjected to small concentrations of acids (acetic and
> formic acid) in normal fuels testing. However, larger concentrations
> of various other acids have not been tested because they are not
> typically found in gasoline or diesel fuels.

(*Id.*; Zohdy Decl., Ex. 6) The report concluded: "[I]t is believed that [the delamination] was due to an unidentified contaminate of the Brazilian diesel fuel used—whether added or generated in the fuel." (Zohdy Decl., Ex. 6)

By late 2003 and early 2004, Ford steel fuel tanks in the United States had delaminated as well. As of January 2004, Ford had received 86 reports of fuel tank delamination. Half, or 43 of the reports came from the Ohio region. (SMF ¶ 74) By June 2004, Ford had established a task force to address the problem. (Zohdy Decl., Ex. 17) Ford collected and analyzed many of the delaminated tanks. Ford found that the tanks were delaminating despite meeting Ford's specifications. (SMF ¶ 75) Magni also conducted an analysis that found no evidence that any of the delaminated tanks were improperly manufactured. (SMF ¶ 76) The parties do not dispute that the delaminations were concentrated in certain geographic areas:

> Throughout Ford's and Magni's investigation, the data showed that
> the delamination issue appeared in clusters that appeared to be
> local or regional in nature.[5] The data did not show a correlation
> between the number of sales and the number of delamination
> claims. For example, Texas had the highest number of sales but
> did not have the highest number of delamination claims.[6]

---

[5]     A March 10, 2005 draft summary report on fuel tank delamination noted that "New data shows that the Ohio region and California are worst affected areas." (Zohdy Decl., Ex. 19)

[6]     Indeed, a retrospective analysis by Ford's expert Dr. Paul Taylor "shows a 40 to 1 ratio between fuel tank replacement rates from the highest state (New York) to the lowest (Wyoming), with geographic clustering in certain parts of the country that could not be explained by fuel tank design alone." (SMF at ¶ 78) Although Coba correctly points out that this analysis was based only on data from Ford's Analytical Warranty System ("AWS"), containing data on repairs made to vehicles where Ford paid at least some of the repair costs (see *id.*; Expert Declaration of Paul M. Taylor (ECF no. 130-5) at ¶ 23), Coba does not explain why the inclusion in the analysis of repairs paid

(SMF ¶ 77) (internal citations omitted)

In addition, as part of its delamination investigation, Ford collected fuel samples from various retail fuel service stations in some areas where delamination had occurred.[7] By February 2005, testing by Ford's Central Lab and Magni detected traces of acid, of unknown origin, in the fuel samples, and determined that acid could cause A36 to delaminate. (SMF ¶ 79) In the ensuing months and years, Ford engineers and managers considered multiple hypotheses to explain the origin of acids in commercially-sold diesel fuel. All the while, Ford employees in sales and customer service pressed engineering for a solution.[8]

The first suspected cause was the use of biodiesel in concentrations higher than 5%. Biodiesel is composed of compounds known as fatty acid methyl esters, and it varies greatly in quality and content (its many possible sources include both soybean oil and French fry grease). (SMF ¶¶ 80-81) Biodiesel is "inherently unstable" and may decompose into acetic and formic acid. (SMF ¶ 82) However, by January 2005, biodiesel was no longer the leading hypothesis. As Doug Olgren, a Ford engineer, wrote at that time to other Ford employees: "At first, we thought it was a bio-diesel issue. When no bio-diesel traces were found in the tanks and fuel samples that we tested, we

---

entirely out-of-pocket should be expected to alter the ratios, nor does Coba suggest that that would be so.

[7]     *See* Zohdy Decl., Ex. 19 (noting fuel sample collection in Ohio and Illinois).

[8]     In June 2005, a Ford customer service division ("FCSD") manager wrote to Ford engineers after a customer inquiry about several instances of delamination in a Californian fleet: "We need to have an answer, this issue is starting to crop up again. This has been an ongoing issue for the past 3 model years." (Zohdy Decl., Ex. 3) On May 3, 2005, Ken Meier, a Ford Commercial Service Manager, wrote to a Ford engineer: "We are still seeing it out in the field . . . We had a conference call with our group yesterday, and this issue came up quite a bit. So is there anything new on the horizon?" (Zohdy Decl., Ex. 22) On March 31, 2006, a Ford employee wrote to the engineer on the team investigating delamination describing fuel injector failures due to delamination: "Of course this is a known issue with fuel tank. . . . We need to know what actions have been taken by your team to address the issue with fuel tank defect. Please provide some information ASAP." (Zohdy Decl., Ex. 30)

then looked at different additives that could cause delamination. We still we[re] not able to find anything." (RSMF ¶ 83; Zohdy Decl., Ex. 57)

By June 2005, Ford engineers were once again considering multiple hypotheses, including biodiesels, acids, and peroxides. In an internal email sent to Ford field managers, Ken Meier provided an update on the state of Ford engineers' knowledge of the issue:

> Engineering is still investigating this issue. Understanding the level of everyone's frustration with this concern allow me to pass along some explanation of what engineering has done, where they are, and what they are continuing to do. Engineering does not exactly know what is causing the paint on the inside of the tank to delaminate. They have some theories (possibly acids, peroxides or bio-diesel fuels). This is only a diesel engine issue. These same tanks are used in gas engine applications with zero reported issues.

> Engineering has reviewed AWS data which shows the issue starting out approximately in 2000 calendar year. It increased in 01, again in 02 and 03 model years. It declined considerably in 04, and they have yet to see any incidents in 2005. To date they have reviewed over 100 claims. The peak in 2002 and 2003 time frame was about the time that there were significant changes in the diesel fuel refining process. Whether this is a contributing cause or not has yet to be determined.

> . . . While this is still under investigation, on going reported concerns from customers, and fleets need to be treated/ handled [as a] fuel related issue.[9]

(Zohdy Decl., Ex. 57)

On November 18, 2005, Ford sent Special Service Message ("SSM") No. 18945 to dealers to assist them in diagnosing complaints of lack of power in 1999-2006 F-Super Duty vehicles. (SMF ¶ 83) That SSM states "Be aware that, in some limited number of cases, delamination of the fuel tank lining may occur on the steel fuel tanks due to the use of fuels containing ethanol,

---

[9]    At least one field manager recipient of the update replied to Ken Meier, offering his own opinion that biodiesel was not the cause, noting: "I have one fleet that runs 100% …biodiesel and has had NO issues." (RSMF at ¶ 83; Zohdy Decl., Ex. 57) (emphasis in original)

methanol, ketones or concentrated of bio-diesel greater than 5%." (*Id.*; Declaration of Eric C. Tew, Ex. 29 (ECF no. 130-4))

Ford's understanding continued to evolve. On September 13, 2006, Ford engineers and managers met to discuss the diesel tank delamination.[10] (Zohdy Decl., Ex. 55, 94) The meeting's findings, as summarized in an email that same day and distributed internally, included the conclusions that "[t]he cause for damaged fuel tanks is biodiesel (both refined and the home brewed type) with bio concentrations greater than 20% (Ford only authorizes concentrations up to 5%)," and that "[d]iesel fuel system damage caused by bio concentrations greater than 20% is an cross industry issue, not just a Ford only issue." (*Id.*) The meeting summary also noted that "customers may not know that they are purchasing fuel that exceeds Ford's allowable levels of bio concentration" because of inaccurate labeling by diesel fuel distributors. The email noted that the inaccuracies could be severe: "even refueling pumps that specify B5 (5% Bio) are known to have Bio concentrations up to 95%." (*Id.*; *see also* SMF ¶ 84). Explaining the origin of the inaccurate labeling, Ford found that "[a] large number of small diesel fuel refiners are beginning to produce diesel fuel and many of these suppliers lack adequate quality control." (Zohdy Decl., Ex. 55, 94) As a result of the meeting, Ford decided to revise its current SSM to clarify that the root cause of delamination was an excessive concentration of biodiesel, not any of the other chemicals to which the SSM referred. (*Id.*)

At the same meeting, Ford also decided to continue to leave the warranty coverage decision in cases of delamination to each dealership's discretion. (*Id.*) In response, David Johnson, an FCSD Service Engineering Operations manager, and one of the meeting summary recipients, was concerned that the decision placed dealers in a "difficult position." Both dealers and customers, said Johnson, lacked an "instantaneous method" to identify the biodiesel

---

[10]     The meeting attendees included Doug Olgren (a senior engineer), Curt Hale (a Ford Customer Service program manager), John Norton (a Truck Service Engineering manager), and Glen Wagner (a Warranty Program manager).

concentration in the fuel tanks, and it was not until 2005 that Ford's Diesel Owner's Guide supplement first mentioned the maximum acceptable biodiesel concentration. (Zohdy Decl., Ex. 55, 94) As a result, even though "[it] may be the fuel provider's fault some concentrations are exceeding 5%," dealers will suffer because their "customers will not see it that way."[11] (*Id.*) In light of Mr. Johnson's comments, one manager suggested updating the supplemental Diesel Owner's Guide to explicitly identify the possible consequences of biodiesel in concentrations greater than 5% and another manager stated that he would add the suggested language to the supplement. (*Id.*)

It was less than one month later, on October 12, 2006, that Coba purchased his first truck. (SMF ¶ 7)

In 2005, Ford asked Magni to develop a new coating that would be more resistant to higher concentrations of biodiesel. (Zohdy Decl., Ex. 8) Magni obliged, and designated the new coating "A35." (SMF ¶ 89) In testing, A35 proved more resistant than A36 to biodiesel. (SMF ¶¶ 91-92) Although Ford initially planned to introduce A35 as part of a more biodiesel-resistant fuel system for the 2010 Model Year, Ford accelerated the introduction A35-coated steel fuel tanks in response to the delamination of some A36-coated tanks. (SMF ¶ 90) The A35 coating was first used on fuel tank service parts in

---

[11]    In October 2005, Ford employee Shawn Lightner made a similar point during an email discussion whether to adopt a confidential draft SSM that would categorize repairs for delamination as not warrantable. (RSMF 83; Zohdy Decl., Ex. 54) Mr. Lightner opposed the draft (which does not appear to ever have been adopted) and wrote:

> They [the customers] do not know what kind of fuel they are buying and cannot control what they get from the station. What are they then to do? Won't this just really turn them against Ford? . . . How do you make [the determination whether to cover under warranty a delamination-related repair]? We only warrant up to 5% biodiesel but we have no real way of proving when someone is using more than 5% since the suspect fuel is always gone by the time they come to dealership. Also, customer [sic] doesn't know what they are using.

(*Id.*)

February 2007 and on production parts beginning in the following month. (SMF ¶ 94).

On February 1, 2007, Ford sent SSM No. 19621 to dealers entitled 1999–2008 F–SUPER DUTY/2004–2007 E–SERIES—LACK OF POWER DUE TO LOW FUEL PRESSURE—FUEL TANK LINER SEPARATION stating:

> SOME 1999–2008 F–SUPER DUTY 350 CHASSIS CABS 450/550, AND 2004–2007 E–SERIES 350/450 VAN/WAGON (35GAL MID–SHIP TANK) VEHICLES WITH A DIESEL ENGINE, MAY EXHIBIT A LACK OF POWER CAUSED BY LOW FUEL PRESSURE. IF NORMAL DIAGNOSTICS LEAD TO A RESTRICTED FUEL FILTER OR FUEL LINES, BE AWARE THAT FLAKING OR SEPARATION OF THE FUEL TANK LINER FROM THE STEEL FUEL TANKS MAY OCCUR DUE TO THE USE OF FUELS CONTAINING CONCENTRATIONS OF BIODIESEL GREATER THAN RECOMMENDED BY FORD (5%). IF FLAKING/SEPARATION HAS OCCURRED, THE FUEL TANK WILL NEED TO BE REPLACED. ALTHOUGH FORD CONTINUES TO RECOMMEND/ALLOW A MAXIMUM BIO–DIESEL CONCENTRATION OF 5%, A NEW FUEL TANK HAS BEEN RELEASED WITH A GREATER ROBUSTNESS TO BIODIESEL[.]

(3AC ¶ 14; Zohdy Decl., Ex. 58)

Just over one month later, on March 9, 2007, Coba purchased his second truck. (SMF ¶ 4) The second truck, like the first, was a 2006 Model Year vehicle, and it had an A36-coated fuel tank. (SMF ¶¶ 7, 14)

## C. Steel Fuel Tank Delamination/Corrosion in Ford Vehicles After Coba's Truck Purchases

After Coba purchased his second truck, Ford continued to receive reports about delamination of A36 tanks and began to receive reports of corrosion[12] in A35 tanks. (*See* SMF ¶¶ 95-96) Internal Ford correspondence indicates that in April 2007 Ford noticed an increasing incidence of delamination: "The issue of tank delamination is really starting to heat up in Fleet. Fleets are purchasing regular 2-D diesel fuel only have tank delamination issue occur, and they are

---

[12]    Because of A35's different formulation, it reacts differently from A36 in that it corrodes rather than delaminates. (SMF 104) Either may cause serious problems for the vehicle's fuel system.

not buying Bio Diesel fuel . . . ." (Zohdy Decl., Ex. 45) In response to the concerns of managers who dealt with customers, Ford engineers continued to insist that the problem was that the fuel industry was improperly using and labeling biodiesel fuels. (*Id.*)

In March 2008, the FCSD regional manager for the Washington, D.C. region noted that delamination was "becoming more problematic throughout the Region" and that he had been receiving an "inordinate number of calls from dealers" about vehicle fuel tanks exhibiting delamination. (Zohdy Decl., Ex. 2) In December 2008, the same manager observed that there was a "proliferation" of delamination cases over the preceding two weeks in the region. (*Id.*)[13]

By mid-May 2008, Ford engineers were continuing to investigate delamination and corrosion, but were apparently—by that point—"in agreement that BioDiesel [was] not the root cause" of the particular type of corrosion they were observing. (Zohdy Decl., Ex. 5)

Steel fuel tanks were not the only components that experienced delamination/corrosion during this period. The fuel industry began to experience corrosion of steel equipment, such as underground storage tanks and other fuel dispensing components, after the June 2006 federal government mandate requiring the use of ultra low sulfur diesel ("ULSD"). (SMF ¶ 99) This coincided with the spike in delamination claims seen by Ford.[14] (SMF ¶ 99)

---

[13]    This marked increase in the delamination incidence rate in 2007 and 2008 is also supported by a Ford customer's email to Ford in April 2008 that a local dealer had gone "from selling one [replacement] fuel tank a month in 2006 to dozens a week in 2007 and 2008." (Zohdy Decl., Ex. 98)

[14]    Coba contends that any measure of delamination's prevalence that is based on warranty data is unreliable for two reasons: 1) The warranty data does not include all repairs due to delamination, *e.g.*, where the vehicle was out of warranty and the consumer paid the entire repair cost out-of-pocket; and 2) According to Coba, "Ford hid the rate of delamination throughout the class period" and that "any calculations based on warranty repairs are unreliable." (*See, e.g.*, RSMF 99) Ford's own employees expressly and repeatedly warned Ford that "warranty data is unreliable in this case" precisely because "these types of failures are typically denied warranty coverage." Zohdy Decl., Ex 48. Ford's employees have stated that "warranty data is not an entirely accurate assessment because it didn't take into consideration the claims that

In 2009, the Petroleum Equipment Institute ("PEI") formed a task force to study the problem. The task force issued its report (the "Batelle Report") in 2012. The Batelle Report noted that "[s]evere and rapid corrosion has been observed" in ULSD storage and dispensing systems since 2007, and that corrosion was coating underground storage tanks. The report identified acetic acid created by a microbe called acetobacter as the likely source of the corrosion. (SMF ¶ 102) The ethanol that the microbe needs to survive is believed to get into the diesel fuel as a result of poor fuel industry practices such as "switch-loading" of fuel in trucks that carry both gasoline and diesel, and poor maintenance of underground storage tanks. (SMF ¶ 102) At the time the parties submitted their briefs, the fuel industry had yet to resolve the corrosion problem, and continued to study it. (SMF ¶ 103)

## II.   DISCUSSION

### A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . .

---

were repaired that weren't under warranty." Zohdy Decl., Ex. 49 (Lightner Tr. at 121:15-25). A Ford engineer expressly testified that it is "safe to say that just looking at warranty numbers did not give the full picture of the delamination issue." Zohdy Decl., Ex. 49 (Lightner Tr. at 121:15-25).

. the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."), *overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Engineers & Participating Employers*, 134 S. Ct. 773 (2014). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

## C. Analysis

### 1.   Breach of Express Warranty

In Count 1, Coba alleges that Ford breached the New Vehicle Limited Warranty by selling Coba the two trucks "knowing that they contained defective fuel tanks" and "by failing to adequately repair and/or replace [the] fuel tanks as Ford promised." (3AC ¶¶ 122-131)

Previously, in its motion to dismiss, Ford argued that Coba's breach of express warranty claim must fail because the alleged defect in the fuel tank is a design defect, while the NVLW covers only defects in materials or workmanship.[15] *Coba v. Ford Motor Co.*, 2013 WL 244687, at *7 (D.N.J. 2013). Judge Debevoise denied the motion to dismiss on that basis, reasoning that "it is unclear whether the Fuel Tank Defect is a design defect or a defect in materials or workmanship, and the Court need not resolve the issue at the pleading stage." *Id.*

Ford's summary judgment motion revives its arguments with respect to the NVLW, noting that "to the extent Coba asserts the defect is one of design, it would not even be covered under the express warranty." (Ford's Motion for Summary Judgment (ECF no.130-1) at 36 n.4) Disagreeing, Coba argues that "[t]o the extent that Ford contends that a warranty cannot encompass a design defect claim . . . that argument has been rejected." (Pl. Opp. at 39 n.17) (citing *In re Saturn L-Series Timing Chain*, 2008 WL 4866604; *Koulajian v. Trek Bicycle Corp.*, 1992 WL 28884, (S.D.N.Y. 1992)). My own view coincides with that of "other courts that have construed 'material or workmanship' warranties [and] have found that they do not cover design defects." *Robinson v. Kia Motors Am., Inc.*, 2015 WL 5334739, at *12 (D.N.J. Sept. 11, 2015) (citing *Nelson v. Nissan N. Am., Inc.*, 2014 WL 7331075, at *2–3 (D.N.J. Dec.19, 2014); *Troup v. Toyota Motor Corp.*, 545 F. App'x 668 (9th Cir. 2013); *Bruce Martin Constr., Inc. v. CTB,*

---

[15]   The NVLW states that "During th[e] coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship." (SMF at ¶ 18)

*Inc.,* 735 F.3d 750 (8th Cir. 2013); *Voelker v. Porsche Cars N. Am., Inc.,* 353 F.3d 516 (7th Cir. 2003)); *see also In re Caterpillar, Inc., C13 and C15 Engine Products Liability Litigation,* 2015 WL 4591236, at *18 (D.N.J. 2015).

*Robinson* and *Nelson* are particularly on point, and I apply their approach to this case. There, as here, the warranties at issue covered defects in materials and workmanship. *Robinson,* 2015 WL 5334739 at *11 (discussing *Nelson,* 2014 WL 7331075 at *2-3). Because, as here, the warranties did not define "materials" or "workmanship," the terms are assigned their ordinary meaning. *Id.* "[T]he Third Circuit has observed . . . [that], absent specific language to the contrary, design defects cannot be encompassed within the meaning of defects in workmanship or materials." *Nelson,* 2014 WL 7331075 at *2-3 (citing *Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc.,* 508 F. App'x 180, 184 (3d Cir. 2012) (applying Pennsylvania law)). As the Third Circuit explained:

> Webster's Dictionary defines "workmanship" as "the art or skill of a workman," or "the execution or manner of making or doing something." *Webster's Third New International Dictionary Unabridged* 2635 (1961). A "workman," or "workingman," is defined as "one who works for wages usually at manual labor." *Id.* As made clear by its focus on the "manual" "execution" of a product, the definition of "workmanship" presupposes that the product being made or assembled has already been designed. Design is an earlier and distinct phase of product production not captured by the workmanship warranty.

*Id.* (quoting *Mack Trucks,* 508 F. App'x at 184).

Coba cites two cases to argue that a workmanship and materials warranty can encompass a design defect claim. (Pl. Opp. at 39 n.17) (citing *In re Saturn L-Series Timing Chain,* 2008 WL 4866604; *Koulajian v. Trek Bicycle Corp.,* 1992 WL 28884, (S.D.N.Y. 1992)) *Nelson* found these citations unpersuasive. "Both cases, however, pre-date the Courts of Appeals' decisions in *Mack Trucks, Bruce Martin Construction,* and *Troup;* and *Koulajian* also predates *Voelker.*" *Nelson,* 2014 WL 7331075, at *3. "Thus, the Court chooses to join the vast weight of authority holding that a workmanship and materials warranty cannot encompass a design defect claim." *Id.* I join *Nelson,* and the

majority of cases, in holding that design defects are not covered by this express workmanship and materials warranty.

Having determined that design defects are not covered by the New Vehicle Limited Warranty, I now apply that legal determination to the facts. That requires me to determine whether Coba is alleging a (non-covered) design defect or a (covered) manufacturing or workmanship defect. The *Nelson* court summarized the distinction between a manufacturing defect and a design defect thus:

> In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs from the manufacturer's intended result or from other ostensibly identical units of the same product line. For example, when a product comes off the assembly line in a substandard condition it has incurred a manufacturing defect . . . . A design defect, by contrast, cannot be identified simply by comparing the injury-producing product with the manufacturer's plans or with other units of the same product line, since by definition the plans and all such units will reflect the same design.

*Nelson*, 2014 WL 7331075, at *2 (citing *Barker v. Lull Engineering Co.,* 573 P.2d 443 (Cal. 1978). "A defect in material is a defect in quality . . . . A defect in workmanship is a defect in the way some part of the machine is constructed . . . . Design, on the contrary, involves the overall plan of construction and operation." *Id.* (citing *Lombard Corp. v. Quality Aluminum Prods. Co.,* 261 F.2d 336, 338 (6th Cir.1958); *see also,* Restatement (Third) Torts: Product Liability § 2 (identifying three distinct "categories of product defect": "manufacturing defect," "design defect," and "inadequate warnings or instructions") and comment d ("whereas a manufacturing defect consists of a product unit's failure to meet the manufacturer's design specifications, a product asserted to have a design defect meets the manufacturer's design specifications but raises the question whether the specifications themselves create unreasonable risks")).

Coba does not specify the type of defect it is alleging. The Complaint, seemingly intentionally, leaves open the possibility that the fuel tanks were

17

defective in design, manufacture, or both.[16] Even now, at the summary judgment stage, Coba refers to the tanks as generally "defective" without specifying a type of defect.[17] Nevertheless, Coba's arguments and the evidence it has submitted make it clear that Coba can only be alleging a design defect.

Essentially, Coba argues that all steel fuel tanks treated with an A36 coating were inadequately designed to withstand the acids prevalent in the fuel supply without delaminating. (*See* Pl. Opp. at 28)[18] Coba's briefing on summary judgment refers to a portion of its briefing on class certification that attributes delamination to a "common *design* flaw because all of the steel diesel fuel tanks were susceptible to delamination when exposed to the fuels in the market." (Pl. Class Cert. Mot. at 16) (cited in Pl. Opp. at 28) (emphasis added) Coba also cites Ford engineer Tim Covert's analysis that the A36 and A35 tanks "*as designed* are susceptible to delamination." (Pl. Opp. at 14) (Coba's emphasis) Further, Coba has not provided any evidence indicating that the delamination

---

[16]   *See* 3AC at ¶¶ 1-2, 25 ("design and/or manufacturing defect"); *id.* ¶¶ 5, 105 (referring to defect(s) "in the design or manufacture" of the fuel tanks); *id.* at ¶ 21 (referring to "defective designs and/or manufacturing"); *id.* ¶ 23 ("Ford simply was unable to design and/or manufacture a diesel fuel tank for the Subject Vehicles that did not delaminate or corrode.").

[17]   *See* RSMF at ¶ 75 ("The analysis showed that the tanks were being attacked by acids and as a result they were delaminating. Therefore they were defective.")

[18]   "Plaintiffs also have established that all of the steel diesel tanks in the Class vehicles had the same design, components, and materials (i.e., steel tank, zinc nickel substrate and paint coating) . . . and that all of the tanks delaminated or were susceptible to delamination for the same reason, as further set forth in Plaintiffs' Motion for Class Certification at 4-6, 11-16." (Pl. Opp. at 28) The cited portion of Plaintiffs' Motion for Class Certification states: "Thus, even under Ford's own root causation theory, delamination is common design flaw because all of the steel diesel fuel tanks were susceptible to delamination when exposed to the fuels in the market. Individual factors do not affect whether the Class vehicles were sold with a diesel fuel tank that was prone to delaminate and whether the fuel tanks, as designed, were susceptible to delamination or experienced delamination when exposed to the fuels containing excessive acids." (ECF no. 131) (emphasis added)

was due to a manufacturing defect—for example, some downstream flaw in the manner in which the coating was applied.[19]

Coba alleged in the alternative that the time limits and terms of Ford's NLVW were unconscionable. (3AC ¶¶ 132-141) However, for the reasons stated above, the NLVW does not cover design defects like the alleged fuel tank defect. Any issue over the warranty time limits and terms, however genuine, is not material for purposes of Rule 56.

Therefore, summary judgment is granted to Ford on Count 1.

### 2.   Breach of the Implied Covenant of Good Faith and Fair Dealing

In Count 2, Coba alleges that "Ford breached the covenant of good faith and fair dealing by repairing [the vehicles], purportedly under warranty, knowing that those repairs and replacements would not fix or remedy the Fuel Tank Defect." (3AC ¶¶ 143-151)

To recover for breach of the implied covenant, a plaintiff must prove that: (1) a contract exists between the parties; (2) the plaintiff performed under the terms of the contract; (3) the defendant acted in bad faith with the purpose of depriving the plaintiff of rights or benefits under the contract; and (4) the defendant's actions caused the plaintiff to sustain damages. *TBI Unlimited, LLC v. Clear Cut Lawn Decisions, LLC*, 2014 WL 3853900, at *3 (D.N.J. Aug. 5, 2014) (citing *Wade v. Kessler. Inst.*, 778 A.2d 580, 586 (N.J. Super. Ct. App. Div. 2001), *aff'd as modified*, 798 A.2d 1251 (N.J. 2002)); *Pactiv Corp. v. Perk-Up, Inc.*, 2009 WL 2568105, at *12-13 (D.N.J. 2009).

---

[19]     The undisputed facts are evidence that there was no manufacturing defect. In response to Ford's statement that "Magni's analysis also confirmed that there was no manufacturing or design defect in the fuel tanks that was causing delamination," Coba disputed the statement's accuracy regarding the design defect only. (See RSMF at ¶76) ("Hibbard testified that Magni could not find any evidence of issues with manufacturing. Ford's citation does not support its statement that Magni's analysis confirmed there was no design defect.") (citations omitted)

Coba's claim fails on the first and third elements. As described above, Ford was not contractually obligated by the NVLW to cover design defects. Its replacements of fuel tanks, then, could not have violated the customer's legitimate expectations and deprived him of the fruits of the contract.

As to Count 2, then, summary judgment is granted to Ford.

### 3.  Violation of the New Jersey Consumer Fraud Act
#### a. Elements of a CFA Claim

Coba's third cause of action arises under the New Jersey Consumer Fraud Act ("NJCFA"). For the reasons expressed herein, and to give the parties a fair opportunity to address the NJCFA issues in light of my resolution of Counts 1 and 2, I am granting leave to submit supplemental briefing.

In a diversity case, this court must interpret substantive state law in accordance with rulings of the state's highest court. Lacking such specific guidance, it must predict how the state court would resolve the issue. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 220–21 (3d Cir. 2008); *Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91–92 (3d Cir. 2008); *see generally Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

NJCFA defines three broad categories of unlawful conduct: affirmative acts, knowing omissions, and regulatory violations. *Federico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Cox v. Sears Roebuck*, 138 N.J. 2, 17 (1994)). Coba's allegations fall within the second category: knowing omissions. "When the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud." *Cox*, 138 N.J. at 18. An actionable omission thus occurs where the defendant "(1) knowingly concealed (2) a material fact (3) with the intention that the consumer rely upon the concealment." *Arcand v. Brother Intern. Corp.*, 673 F. Supp. 2d 282, 297 (D.N.J. 2009).

Coba alleges that Ford knowingly concealed the material fact that "the Class Vehicles suffered from a common defect resulting in fuel tank material

20

clogging portions of the fuel system, thereby causing sudden loss of power to the engine, sudden loss of forward propulsion, and stalling while driving the Class Vehicles" by "purposefully fail[ing] to disclose this to Plaintiffs and Class Members during the purchase of the vehicle and, in fact, actively conceal[ing], suppress[ing] and omitt[ing] any mention of the Fuel Tank Defect." (3AC ¶ 153) Coba further alleges that "Ford purposefully and knowingly failed to disclose the Fuel Tank Defect in the Class Vehicles and replacement tanks in order to secure the sale of these vehicles or replacement tanks at a premium price and also to mislead owners during the express warranty period to avoid having to perform their contractual duties under the warranty." (3AC ¶ 160)

Coba's omissions claim, as noted above, requires a showing that Ford knowingly concealed a material fact with the intention that the consumer rely on that omission. *See Arcand*, 673 F. Supp. 2d at 297. Implicit is the requirement that the defendant be subject to an "underlying duty . . . to disclose what he concealed to induce purchase." *Id.* "Obviously, there can be no [unlawful conduct], or reliance for that matter, if the defendant was under no obligation to disclose the information in the first place." *Id.* Whether a defendant was subject to a duty to disclose is a question of law that must be determined in light of the factual circumstances. *Judge v. Blackfin Yacht Corp.*, 357 N.J. Super. 418, 426-27 (App. Div. 2003) (citing *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 135 N.J. 182 (1994)).

Ford contends that Coba has not raised a material factual dispute with regard to the unlawful conduct element of its omissions claim because Ford violated no duty to disclose the alleged material facts relating to the fuel tank delamination at the time of Coba's purchases. There is well developed case law, cited by both sides, as to the nature and scope of a manufacturer's duty of disclosure with respect to a *warranted* defect. *See, e.g., Mickens v. Ford Motor Co.*, 2015 WL 5310755, at *8 (D.N.J. Sept. 10, 2015) (citing *Tatum v. Chrysler Grp., LLC*, 2011 WL 1253847, *5 (D.N.J. March 28, 2011)). As to such a defect, the duty to disclose arises if the manufacturer knows the failure is certain, or

highly likely, to occur. Both sides seem to have briefed the NJCFA duty to disclose issue on the assumption that this was a warranted defect. (Understandably so. Ford takes the position that it could not reliably identify the nature of the problem but honored warranty claims in the interim; Coba takes the position that the defect was covered by the NVLW.) As stated above, however, I find that the allegations and proofs relate solely to a design defect, not covered by the express warranty. Further, there is no implied warranty claim—a common backstop—asserted.

I think that, in fairness, the parties should be given the opportunity to address the NJCFA duty-to-disclose issue in light of my disposition of the express warranty issue. Consequently, I will administratively terminate this portion of Ford's summary judgment motion without prejudice; grant leave to file optional supplemental briefs within 20 days; and reopen the motion in light of any submissions received.

### 4.   **Common Law Fraud**

Count 4, Coba's common law fraud claim, fails becuase Ford does not owe any common law duty to disclose to Coba. "Common law fraud involves a more onerous standard than a claim for fraud under the CFA because under the CFA a plaintiff does not have to prove that he was actually misled or deceived." *Rait v. Sears Roebuck & Co.*, 2009 WL 250309, at *5 (D.N.J. Feb. 3, 2009) "'The elements of a common law fraud claim under New Jersey law are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.'" *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 103 n. 15 (3d Cir.2013) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 691 A.2d 350, 367 (1997)).

Judge Debevoise has already held (in connection with concealment tolling the statute of limitations) that Ford does not owe any common law duty

to disclose to Coba. *Coba v. Ford Motor Co.*, 2013 WL 244687, at \*12 (D.N.J. 2013). In so finding he explained that "To the extent [Coba's] allegations of fraudulent concealment are based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a special relationship." *Id.* He further found that Coba did not "identify any specific ambiguous partial disclosures or statements by Ford" and that "New Jersey Courts have found no special relationship between individual consumers and automobile manufacturers that would impose a duty to disclose on the manufacturers." *Id.*

Coba provides no compelling arguments in favor of a duty to disclose, and no persuasive reason why this Court should reconsider the statement of the law that underlay its earlier ruling.[20] Coba's proffered proofs do not alter

---

[20]     Judge Debevoise cited and relied substantially on the Third Circuit's statement of the New Jersey law of fraud:

[W]here a claim for fraud is based on silence or concealment, New Jersey courts will not imply a duty to disclose, unless such disclosure is necessary to make a previous statement true or the parties share a "special relationship." *Berman v. Gurwicz*, 189 N.J.Super. 89, 458 A.2d 1311, 1313 (Ch.Div.1981) (duty of full disclosure may arise from one party's having made partial disclosure to other or from nature of transaction and relationship between them), *aff'd*, 189 N.J.Super. 49, 458 A.2d 1289 (App.Div.), *certif. denied*, 94 N.J. 549, 468 A.2d 197 (1983); *see also Jewish Ctr.*, 432 A.2d at 525 (where applicant for rabbinical position omitted mention of his prior criminal convictions on employment application, congregation stated proper claim of fraudulent concealment "because of the unique moral and spiritual relationship between clergy and congregation"); *Viviano v. CBS, Inc.*, 597 A.2d at 548 (recovery for fraudulent concealment requires proof that defendant legally was obligated to disclose); *Tele–Save Merchandising Co. v. Consumers Distrib. Co.*, 814 F.2d 1120, 1125 n. 2 (6th Cir.1987) (dissenting opinion) ("in the absence of a fiduciary relationship, nondisclosure does not constitute fraud under New Jersey law"); Restatement (Second) of Torts § 551 (requiring disclosure only where defendant knows information whose nondisclosure will make earlier partial or ambiguous statement of facts to become misleading or where defendant is in a fiduciary or special relationship with plaintiff); W. Page Keeton, Prosser & Keeton On the Law of Torts § 106 at 738–40 (5th Ed.1984) (same).

the basis for Judge Debevoise's statement of the governing standard. Coba has not demonstrated a genuine issue whether Ford had a duty to disclose for purposes of a common law fraud claim.

For these reasons, I grant Ford summary judgment as to Count 4.

## III.   CONCLUSION

For the reasons set forth above, Ford's motion for summary judgment is GRANTED as to Counts 1, 2, and 4. The motion as to Count 3 is administratively terminated pending supplemental briefing.

Coba's Motion for Class Certification (ECF No. 131) is denied as MOOT. That denial is without prejudice to reinstatement, if and as appropriate, in light of my disposition of the summary judgment motion as to Count 3.

An appropriate Order follows.

Dated: September 30, 2016

*(signature)*

**HON. KEVIN MCNULTY, U.S.D.J.**

---

   Three categories of relationships give rise to a duty to disclose: (1) fiduciary relationships, such as principal and agent, client and attorney, or beneficiary and trustee; (2) relationships where one party expressly reposits trust in another party, or else from the circumstances, such trust necessarily is implied; and (3) relationships involving transactions so intrinsically fiduciary that a degree of trust and confidence is required to protect the parties. *Berman v. Gurwicz*, 458 A.2d at 1313.

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1185 (3d Cir. 1993).

   Coba argues that Ford's reliance on *Lightning Lube* is misplaced because courts in this District have found a duty to disclose in common fraud cases where there is a safety concern. However, it relies primarily on *In re Philips/Magnavox Television Litig.*, 2010 WL 3522787, *7 (D.N.J. Sept. 1, 2010) ("A duty to disclose can arise where there is a *safety concern*, a fiduciary relationship, or where an omission is contrary to a representation actually made by the defendant."), and fails to note that the quoted language is actually from three California cases.