| | |
|---|---|
| **GALO COBA and COBA LANDSCAPING AND CONSTRUCTION, INC., individually, and on behalf of other members of the general public similarly situated,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**FORD MOTOR COMPANY,**<br><br>**Defendant.** | Civ. No. 12-1622 (KM) (MAH)<br><br>**OPINION** |

## KEVIN MCNULTY, U.S.D.J.:

Plaintiffs Galo Coba and Coba Landscaping and Construction, Inc. ("Coba Landscaping")[1] bring this putative class action against Defendant Ford Motor Company ("Ford"). The Third Amended Class Action Complaint (the "Complaint") (ECF no. 91)[2] contains four counts arising out of Ford's alleged

---

[1]     Plaintiffs will generally be referred to collectively as "Coba," unless otherwise specified.

[2]     My prior Summary Judgment Opinion (ECF no. 149) will be referred to herein as "SJ Op." It is reported as *Coba v. Ford Motor Co.*, No. 12-1622 (KM) (MAH), 2016 WL 5746361, at *12 (D.N.J. Sept. 30, 2016). As in that prior opinion, certain record items, cited repeatedly, will be abbreviated as follows:

> "3AC" = Third Amended Class Action Complaint (ECF no. 91)
>
> "Def. Mot." = Defendant Ford Motor Company's Memorandum in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (ECF no. 130-1)
>
> "Def. Facts" = Defendant's Statement of Material Facts (ECF no. 130-1)
>
> "Pl. Facts" = Plaintiff's Response to Ford's Statement of Material Facts (ECF no. 130-7)
>
> "Pl. Opp." = Coba's Opposition (ECF no. 130-7)

1

inability to cure a defective fuel tank installed in certain Ford F–Series Super Duty trucks and E–Series vans.

Now before the Court is Ford's motion (ECF no. 130-1) for summary judgment. In a previous Opinion (ECF no. 149), I granted summary judgment to Ford on Counts 1, 2, and 4, which allege breach of express warranty, breach of the implied contractual covenant of good faith and fair dealing, and common law fraud. At that time, I also administratively terminated without prejudice the portion of Ford's summary judgment motion concerning Count 3, which alleges a violation of the New Jersey Consumer Fraud Act (the "NJCFA"), N.J. Stat. Ann. § 56:8–2, and I granted leave to submit supplemental briefing.

The parties have submitted supplemental briefing and, for the reasons stated below, I will grant summary judgment to Ford on Count 3. This opinion assumes familiarity with my prior Summary Judgment Opinion, and should be read in conjunction with it.

## I.    FACTS

The facts, as set forth in my previous Summary Judgment Opinion, are incorporated here by reference. (*See* SJ Op. 2–13, 2016 WL 5746361 *1–*7.)

## II.    DISCUSSION

### A. Summary Judgment Standard

The familiar legal standards governing a motion for summary judgment are likewise incorporated by reference, and will not be repeated here. (*See* SJ Op. 13–14, 2016 WL 5746361 *7–*8.)

---

"Zohdy Decl." = Declaration of Tarek H. Zohdy (ECF no. 130-8 through 130-13)

"Pl. Supp. Br." = Plaintiffs' Supplemental Brief Re: Defendant's Motion for Summary Judgment (ECF no. 154)

"Def. Supp. Br." = Defendant Ford Motor Company's Supplemental Brief in Support of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (ECF no. 153)

### B. Analysis

#### 1. Violation of the New Jersey Consumer Fraud Act
##### a. Elements of a CFA Claim

Coba's third cause of action arises under the New Jersey Consumer Fraud Act ("CFA"). In a diversity case, this court must interpret substantive state law in accordance with rulings of the state's highest court. Lacking such specific guidance, it must predict how the state court would resolve the issue. *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 220–21 (3d Cir. 2008); *Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91–92 (3d Cir. 2008); *see generally Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

The New Jersey Legislature enacted the NJCFA in 1960 to address fraudulent practices in the market for consumer goods and to deter such conduct by merchants. *Furst v. Einstein Moomjy, Inc.*, 182 N.J. 1, 11 (2004) (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 21 (1994)). As amended in 1971, the statute confers a private right of action for consumers who have suffered from unconscionable or fraudulent practices in the marketplace:

> Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act of the act hereby amended and supplement may bring an action or assert a counterclaim therefor in any court of competent jurisdiction.

N.J. Stat. Ann. § 56:8-19. The NJCFA is to be liberally construed in favor of the consumer, *see Cox,* 138 N.J. at 14, and "applied broadly in order to accomplish its remedial purpose," *Gonzalez v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) (quoting *Lemelledo v. Beneficial Mgmt. Corp.*, 150 N.J. 255, 264 (1997)); *see also Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 604 (1997).

"To state a *prima facie* case under the CFA, a plaintiff must demonstrate three elements: (1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Payan v. GreenPoint Mortgage*

3

*Funding*, 681 F. Supp. 2d 564, 572 (D.N.J. 2010) (citing *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557 (2009)); *accord Gonzalez*, 207 N.J. at 576.

The first element of an NJCFA claim—unlawful conduct—is defined as: "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8-2. From this statutory definition, courts have derived three broad categories of unlawful conduct: affirmative acts, knowing omissions, and regulatory violations. *Federico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citing *Cox*, 138 N.J. at 17).

Coba's allegations fall within the second category: knowing omissions. "When the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud." *Cox*, 138 N.J. at 18. An actionable omission thus occurs where the defendant "(1) knowingly concealed (2) a material fact (3) with the intention that the consumer rely upon the concealment." *Arcand v. Brother Intern. Corp.*, 673 F. Supp. 2d 282, 297 (D.N.J. 2009).

### b. Coba's New Jersey CFA Claim

Coba alleges that Ford knowingly concealed the material fact that "the Class Vehicles suffered from a common defect resulting in fuel tank material clogging portions of the fuel system, thereby causing sudden loss of power to the engine, sudden loss of forward propulsion, and stalling while driving the Class Vehicles" by "purposefully fail[ing] to disclose this to Plaintiffs and Class Members during the purchase of the vehicle and, in fact, actively conceal[ing], suppress[ing] and omitt[ing] any mention of the Fuel Tank Defect." (3AC ¶ 153) Coba further alleges that "Ford purposefully and knowingly failed to disclose the Fuel Tank Defect in the Class Vehicles and replacement tanks in order to secure the sale of these vehicles or replacement tanks at a premium price and

also to mislead owners during the express warranty period to avoid having to perform their contractual duties under the warranty." (3AC ¶ 160)

Coba's omissions claim, as noted above, requires a showing that Ford knowingly concealed a material fact with the intention that the consumer rely on that omission. *See Arcand*, 673 F. Supp. 2d at 297. Implicit is the requirement that the defendant be subject to an "underlying duty . . . to disclose what he concealed to induce purchase." *Id.* "Obviously, there can be no [unlawful conduct], or reliance for that matter, if the defendant was under no obligation to disclose the information in the first place." *Id.* Whether a defendant was subject to a duty to disclose is a question of law that must be determined in light of the factual circumstances. *Judge v. Blackfin Yacht Corp.*, 357 N.J. Super. 418, 426-27 (App. Div. 2003) (citing *Carter Lincoln-Mercury, Inc., Leasing Div. v. EMAR Grp., Inc.*, 135 N.J. 182 (1994)).

Ford contends that Coba has not raised a material factual dispute with regard to the unlawful conduct element of its omissions claim. Ford states that it violated no duty to disclose the alleged material facts relating to the fuel tank delamination at the time of Coba's purchases.

There is well-developed case law, cited by both sides in the initial briefing on this motion, as to the nature and scope of a manufacturer's duty of disclosure with respect to a *warranted* defect. *See, e.g., Mickens v. Ford Motor Co.*, No. 10-CV-5842 KM MAH, 2015 WL 5310755, at *8 (D.N.J. Sept. 10, 2015) (citing *Tatum v. Chrysler Grp., LLC*, 2011 WL 1253847, *5 (D.N.J. March 28, 2011)). Automobile manufacturers commonly warrant their cars against failures for a period of time. Thus freedom from, *e.g.*, fuel tank failure for a fixed period of years becomes part of the bargained-for exchange; if such a failure occurs, it will be remedied at the manufacturer's expense. It is well known that automobiles do not always function flawlessly; that is the very reason for a warranty. Where the relevant defect was covered by a warranty, then, "it is not sufficient to allege that the defendant manufacturer knew that a part *might* fail [due to the defect] before the warranty expired but concealed

5

that knowledge." *Alban v. BMW of N. Am., LLC*, 2010 WL 3636253, at *10 (D.N.J. Sept. 8, 2010) (emphasis in original) (citing *Perkins v. DaimlerChrysler Corp.*, 383 N.J. Super. 99, 111–12, 890 A.2d 997 (App. Div. 2006)). Instead, "[t]o support a CFA cause of action for fraud in the context of a warranted defect, a plaintiff must show that the manufacturer was not in good faith insuring against a risk, but that it actually 'knew *with certainty* that the product at issue or one of its components was going to fail." *Mickens*, 2015 WL 5310755, at *8 (citing *Tatum*, 2011 WL 1253847, *5 (emphasis in original)). "Only then will a concealed, but warranted-against, defect furnish the basis for a CFA claim." *Id.*

Originally, both sides seemed to have briefed the NJCFA duty to disclose issue on the assumption that the fuel tank delamination was a warranted defect. As I noted in my earlier Summary Judgment Opinion, that was an understandable assumption, given Ford's "position that it could not reliably identify the nature of the problem but honored warranty claims in the interim" and Coba's "position that the defect was covered by the NVLW." (S.J. Op. at 22, 2016 WL 5746361 at *12). However, because I found that the allegations and proofs relate solely to an alleged design defect, not covered by the express warranty (and there is no implied warranty claim asserted), I granted the parties the opportunity to address the NJCFA duty-to-disclose issue in light of my disposition of the express warranty issue.

The parties have submitted supplemental briefs on the issue of the duty to disclose in relation to a non-warranted defect. I now turn to that question.

The parties agree that the NJCFA is applicable whether or not the allegedly omitted defect was covered by a warranty. Thus, the disputed question here is not whether the NJCFA protects the consumer from non-warranted defects, but rather *what standard* should govern the duty to disclose. Must plaintiffs demonstrate that a defendant knew that a product was *certain* to fail, as in the *Alban* line of cases? Or is the knowledge that a product *may* fail sufficient to trigger a duty to disclose a non-warranted defect?

For its part, Coba argues that in the "absence of warranty coverage . . . courts do not insist that the defendant know that a defect would arise in 100% of the cases before finding an omissions claim actionable, with or without warranty." (Pl. Supp. Br. 2–3) Coba further contends that if the *Alban* certainty standard is applied in the absence of a warranty, "defendants will be in the perverse position of being able to escape liability entirely under the NJCFA simply because they did not warrant a known defect that is prone to failure but does not fail at a 100% rate." (Pl. Supp. Br. 3–4) Coba argues that "[t]he Court's finding that the fuel tank delamination defect is not covered by warranty can only aid Plaintiffs—not Ford. This is because the existence of a warranty is typically invoked as a defense to a claim that defendant violated the NJCFA." (Pl. Supp. Br. 8)

In contrast, Ford asks the Court to apply the certainty standard here, arguing that "*Alban* and its progeny are nearly indistinguishable from this case." (Def. Supp. Br. 4) This is so, says Ford, because "there is no conceptual distinction between a defect that is not covered by warranty because it falls outside the durational limitation (as in the *Alban*-line of cases) versus a defect that falls outside the scope of the warranty (as in this case)." "[B]oth what [the warranty] covers and for how long," says Ford, "are 'part of the benefit of the bargain between the parties.'" (*Id.* at 4–5) (quoting *Thiedemann v. Mercedes-Benz U.S.A., LLC*, 872 A.2d 783, 794 (N.J. 2005); and citing *Mickens*, 2015 WL 5310755, at *8 (warranty duration is "part of the bargained-for exchange" between the manufacturers and purchasers)).

Ultimately, however, I find it unnecessary to predict how the New Jersey Supreme Court would resolve this question of law. Even without applying a certainty standard, no reasonable factfinder could conclude, based on the record evidence, that Ford knowingly concealed a material fact with the intention that Coba rely upon the concealment at the time he purchased his vehicles—or that Ford had an obligation to disclose the information known to it about this alleged defect at the time. *See Arcand*, 673 F. Supp. 2d at 297.

7

### i. Ford's Knowledge of a Design Defect

First, even assuming *arguendo* that the A36 fuel tanks were defectively designed,[3] Ford could not have possessed a duty in relation to information it did not have. Therefore, only evidence bearing on Ford's knowledge before March 9, 2007—the date on which Coba purchased Vehicle 2[4]—is relevant.[5] That evidence, however, has not borne out the allegation that Ford knew, at the time of Coba's purchases, that the A36 tanks were defectively designed, such that they were susceptible to delamination when encountering acids prevalent in the standard diesel fuel supply.

The undisputed evidence shows that prior to March 9, 2007, Ford did know that some number of steel fuel tanks were delaminating in the United States.[6] The delamination was not localized in a single region, but its prevalence varied substantially by region (Def. Facts ¶ 77). Ford also knew that customers who experienced delamination could incur serious repair costs and

---

[3] Ford argues that "the undisputed evidence shows that there is no manufacturing or design defect in the A36 coating." (Def. Mot. 23; Def. Supp. Br. 10) Coba counters that the tanks should have been designed to withstand more acidic fuels. However, the parties' briefs primarily focus on the question of Ford's knowledge rather than the question of whether Ford's design was defective, and so I do as well.

[4] Coba also alleged that Ford violated the NJCFA in the sale of defective replacement tanks. (3AC ¶ 166) ("As a result of Ford's conduct, Plaintiffs and Class Members purchased Class Vehicles or replacement tanks not knowing, as Ford did, about the Fuel Tank Defect and suffered an ascertainable loss.") However, the replacement tanks that delaminated were replaced under warranty at no cost to Coba. Therefore, Coba suffered no "ascertainable loss." *Thiedemann*, 183 N.J. at 251, 872 A.2d at 794 ("The defects that arise and are addressed by warranty, at no cost to the consumer, do not provide the predicate 'loss' that the CFA expressly requires for a private claim under the CFA, bringing with it the potential for treble damages, attorney's fees, and court costs and fees."). As for the A35 replacement tanks for which Coba partially paid under extended service plans, Coba does not allege that they have delaminated.

[5] Much of Coba's evidence is irrelevant to what Ford knew when Coba purchased the two vehicles.

[6] *See, e.g.*, Zohdy Decl. Ex. 3 ("We need to have an answer, this issue is starting to crop up again. This has been an ongoing issue for the past 3 model years.").

were upset.[7] By that point, it was already important to Ford to address the problem in order to improve their product and retain customers.[8] Ford engineers were actively attempting to identify the cause of the delamination and develop a solution.[9]

The evidence of Ford's knowledge prior to Coba's purchases also clearly bears out that Ford genuinely *believed* that fuel contamination, and not a design defect, was responsible for the instances of tank delamination, and that customers who used only non-contaminated fuel that did not exceed 5% biodiesel would not experience delamination. Coba objects that this did not turn out to be true, but the state of Ford's knowledge and belief in this time-frame is uncontradicted in the evidence.

Thus, the epoxy-based coatings on steel fuel tanks had performed without *any* reported problems from 1993 until 2001. (Def. Facts ¶ 66) Once cases of delamination arose, Ford formed a task force to study the problem. Ford's internal emails, its design decisions, and the SSMs it distributed to dealers, are clear evidence that around the time that Coba purchased his two vehicles Ford believed that high concentrations of biodiesel were responsible. On September 13, 2006, only one month before Coba purchased Vehicle 1, a meeting of Ford managers and engineers concluded that "[t]he cause for damaged fuel tanks is biodiesel (both refined and the home brewed type) with bio concentrations greater than 20% (Ford only authorizes concentrations up to 5%)." (Zohdy Decl. Ex. 55, 94) Ford also asked Magni to develop the A35 coating to be more resistant to higher concentrations of *biodiesel*. (Def. Facts ¶¶ 89–94) Further, on February 1, 2007, approximately one month before Coba purchased Vehicle 2, Ford distributed an SSM to dealers that identified the use

---

[7]     *See, e.g.,* Zohdy Decl. Ex. 20.

[8]     *See, e.g.,* Zohdy Decl. Ex. 44 (An engineer noted, "I [know] the customers are frustrated. So are we.")

[9]     *See, e.g.,* Zohdy Decl. Ex. 17 ("A task force has been assembled to address [the tank delamination issue].")

of fuel with high concentrations of biodiesel as a possible cause of delamination and reiterated that Ford vehicles should only use a maximum 5% biodiesel concentration.

There is also unrebutted evidence of geographic clustering of the delamination reports showing non-uniformly distributed pockets throughout the country. Such clustering strongly corroborates Ford's contention that it reasonably believed that delamination was not due to a fuel tank design problem, but rather to local instances of contaminated fuel, or fuel containing higher-than-authorized levels of biodiesel.

Further, the warranty data that Ford had available to it at the time of Coba's purchase is consistent with Ford's claim that it did not know that Coba's fuel tanks were particularly susceptible to delamination. According to Ford's expert Dr. Paul Taylor, at the time Coba purchased his two F-350 trucks (late 2006 – early 2007), the nationally reported rate of tank delamination in the 2003 –  2007 6.0L diesel trucks (with Magni-lined steel diesel fuel tanks) was under 1%. (Taylor Decl. ¶ 37). The rate of replacement "was consistent across the then-available model year trucks." (*Id.*)

Coba argues that this warranty data is underinclusive because it does not capture the cases where delamination occurred after the warranty expired, or where Ford denied coverage for some other reason.[10] Coba also cites multiple statements by Ford engineers to this effect. (Pl. Opp. 20) Coba's point might be well taken if the issue were, *ex post,* the actual rate of delamination that materialized.[11] The issue material to Coba's NJCFA claim, however, is

---

[10]     Dr. Taylor's analysis included any repair recorded in Ford's warranty database, which included all cases where Ford paid any portion of a repair, whether in warranty or not. (Taylor Decl. ¶¶ 23, 37, 39(e); Tew Decl. Ex. 1 at 41:1-42:1, 104:15-19) That data presumably would not capture cases in which the customer paid the entire cost of repair out-of-pocket.

[11]     Ford counters that Dr. Taylor's analysis was also overinclusive in that it included all fuel tank repairs, including even those that were not delamination-related. (Ford Reply Br. 9)

Ford's knowledge at the time of Coba's purchases. The evidence shows that Ford relied on its warranty database to assess the prevalence of the delamination problem. (*E.g.*, Zohdy Decl. Ex. 57) ("Engineering has reviewed AWS [Analytical Warranty System] data . . . .") That seems to be a reasonable source of real-time data on which a company could rely. Of course, Ford could have reasoned that the actual rates might be somewhat higher than those suggested by the AWS data, to some unknown degree. The possibility of such an adjustment does not alter the clear import of the evidence with respect to Ford's knowledge at the time. What Ford knew was that the tanks for all model years were failing at a rate around 1%.[12] No reasonable jury could conclude that Ford knew that the few steel diesel fuel tanks afflicted with delamination had failed due to a design defect (which, I suppose, could affect the performance of as many as 100% of the tanks). Ford could, and did, reasonably conclude that the failures resulted from the intentional or unintentional use of unauthorized fuels.

In the absence of contrary quantitative evidence of the prevalence of delamination in late 2006 – early 2007, Coba attempts in other ways to create a genuine issue that Ford knew the tanks were defective. However, Coba does not succeed in establishing a triable issue that Ford knew prior to Coba's purchase of the vehicles that A36 tanks were defectively designed. While Coba points to statements of "concern" about the delamination issue, and so on, the evidence does not add up to a triable issue that Ford knew there was a defect.

---

[12]     Coba also claims "the warranty data should not have been relied upon because Ford orchestrated the low warranty repair rate by improperly denying warranty claims on the pretext that customers were not using the proper diesel fuel (i.e., that customers were using diesel fuel with more than 5% biodiesel content)." (Pl. Opp. 22) As described above, it is abundantly clear that Ford believed at that time that biodiesel was the cause. Even so, Ford's stated policy was to "deny warranty coverage only if fuel samples taken from the subject vehicle proved that the customer had used biodiesel above 5%." (Def. Facts ¶ 106) Coba's only reply is that Ford had no methodology in place for dealers to analyze the fuel in a delaminated tank. (Pl. Facts ¶ 106)

Coba observes that, in the 2006–07 timeframe of his purchases, Ford was already in the process of developing the A35 tank as a more robust replacement for the A36 tank. Further, Ford accelerated the replacement timeline "due to problems experienced by some vehicles with A36 tanks." In addition, Coba also points to Ford's failure to communicate information about delamination directly to customers purchasing vehicles with A36 tanks, even after deciding to accelerate the development of A35. From that evidence (in context, of course), Coba asks the Court to find a triable issue that Ford intended that customers rely on Ford's concealment of the alleged defect. (Pl. Opp. 9–10)

Coba also asserts that "Ford knew that steel diesel fuel tank delamination was serious and widespread." (Pl. Opp. 9). As evidence, Coba points to the Special Service Bulletins (SSMs) that Ford sent to dealers only.[13] On November 18, 2005, Ford sent a Service Tip regarding delamination to dealers notifying them that "in some limited number of cases, delamination of the fuel tank lining may occur on the steel fuel tanks due to the use of fuels containing ethanol, methanol, ketones or concentrations of bio-diesel greater than 5%."[14]

---

[13] Coba cites *Marsikian v. Mercedes Benz USA*, LLC, 2009 WL 8379784, at *6 (C.D. Cal. May 4, 2009), and *Skeen v. BMW of N. Am., LLC*, 2014 WL 283628, at *10 (D.N.J. Jan. 24, 2014), to suggest that an SSM or similar communication only to dealers reflects an intention to conceal a problem from the general customer base and that a defendant "knew with certainty that the part would fail." (Pl. Opp. 9–10) However, both cases were decided at the motion to dismiss stage. Here, at the summary judgment stage, this Court must consider, in light of all the evidence presented, whether there is a genuine dispute of material fact, not just whether the allegations are plausible.

[14] Coba asserts that, in January 2006, "a Ford engineer recommended communicating 'the SSM content directly to our customers.'" (Pl. Opp. 10) (citing Zohdy Decl. Ex. 103) (Referencing SSM 18893) However, in context, the engineer was asking whether there was a way to communicate the content to customers (i.e., that using greater than 5% biodiesel can cause engine or fuel system concerns) in response to an article about a specific controversy over biodiesel in Minnesota.

That Ford did not communicate directly with customers regarding A36 tank delamination while, at the same time, it accelerated development of A35 as a replacement and alerted dealers to delamination occurring "in some limited number of cases" does not support a finding that Ford intentionally concealed knowledge of a defect from owners or purchasers.[15] On the contrary, the SSM underscores that the incidence of delamination was "limited." Further, that Ford did not announce to its customers that it was developing an improved fuel tank does not generate a triable issue that Ford intended to conceal from consumers the fact of a design defect.

Coba does cite many statements by Ford and Magni employees that underscore the duration of the problem and the importance of finding a solution. Coba cites Ford's and Magni's internal emails,[16] describing tank delamination as "very serious issue," a "big issue," an "ongoing issue," and a "known issue." (Pl. Opp. 10–13) It is not disputed that Ford had been aware of instances of tank delamination since around 2001 and was taking it seriously.[17] Coba's evidence, however, fails to bridge the chasm between (a) demonstrating that delamination was a known issue that Ford was addressing

---

[15]  *See Chan v. Daimler AG*, No. CIV.A. 11-5391 JLL, 2012 WL 5827448, at *7 (D.N.J. Nov. 9, 2012) ("[S]ervice bulletins do not amount to an admission that the M156 engines were in fact defective, or that any defects were "manifest" as of the time the bulletins were issued. . . . [S]ervice bulletins and other technical advisories 'are generally the result of consumer complaints that cause a manufacturer to investigate, diagnose, and remedy a defect in one of its products. Accepting these advisories as a basis for consumer fraud claims [or as any other admission of liability] may discourage manufacturers from responding to their customers in the first place.'").

[16]  These emails are mostly quoted at greater length in the Background section above.

[17]  Coba's observation that Magni's October 2001 report alerted Ford to the fact that acetic and formic acids were possible causes of the delamination process that had been observed in several vehicles in Brazil (Pl. Opp. 8), is not probative of the relevant issue. First, Coba ignores the report's conclusion that an "unidentified contaminate of the Brazilian diesel fuel used" was responsible. (Zohdy Decl. Ex. 6) Second, knowing that the acids can cause delamination does not translate into knowledge that the steel fuel tanks are likely to encounter excessive levels of those acids during the tanks' expected useful life.

seriously, and (b) demonstrating a genuine issue as to whether Ford knew that Coba's vehicle's fuel tanks were defectively designed such that they were susceptible to delamination while holding standard fuels. Any fuel tank presumably will delaminate, corrode, or otherwise degrade under *some* conditions; absent evidence that its fuel tanks were delaminating in significant numbers, under reasonable and recommended conditions of use, Ford cannot be said to have been on notice of a "defect."

Some of Coba's other evidence is neutralized by its own context. A Ford engineer's January 2005 statement that "there needs to be a sense of urgency here" is explained not by the pervasiveness of delamination, but by the expense that can result if delamination "take[s] out other expensive parts downstream" in the fuel system. (Zohdy Decl. Ex. 20) Similarly, a January 2004 Magni email is an excellent example of a statement that can take on outsized meaning out of context. The email notes that Ford was "seeing a large number of dealer complaints that paint is peeling inside the diesel tanks . . . very similar to the Brazilian problem of about 1 year ago," and describes Ford as "quite concerned" about the delamination problem. (Zohdy Decl. Ex. 14) The email includes a prior message from a Ford employee attaching a spreadsheet of warranty data from 2000–2003 for the F-Series showing that "the interior coating of the fuel tank coming off to plug up the fuel system." Subjective levels of "concern," however, are no substitute for data. As of the month that email was sent, Ford had received only 86 reports of fuel tank delamination (43 of which were from Ohio) (Def. Facts ¶ 74) By March 2005, Ford was aware of only 156 warranty claims for delamination between January 2000 and January 2005. (Zohdy Decl. Exs. 19, 7) Further, the forwarded email from Ford offers a reason for Ford's "concern": "These are costly repairs." (Zohdy Decl. Ex. 14) So, in context, this email—and others like it[18]—are not evidence that Ford knew

---

[18]    *E.g.*, Zohdy Decl. Ex. 22 (In May 2005, a Ford commercial service manager wrote: "we are still seeing [delamination] out in the field with rust forming in the tanks

that Coba's fuel tanks were defectively designed and prone to delamination. They are evidence that Ford was concerned about resolving a costly problem that afflicted a small number of vehicles with steel fuel tanks—hardly the stuff of a viable consumer fraud claim.

Similarly self-neutralizing is Coba's citation of a Ford engineer's testimony "that in early 2006 the delamination issue was 'not epidemic, but certainly it was high enough where we knew that we had to do something about it' and that 'something' was 'to switch to A35 coating.'" (Pl. Opp. 13) The statement, by its own terms, is that delamination was sufficiently prevalent to have met Ford's threshold for deciding to respond to the issue; it does not constitute evidence that the fuel tanks were defectively designed or likely to fail. And the engineer explicitly affirms that the prevalence was "not epidemic." The same goes for Coba's citation to a Ford engineer's 2005 recommendation that Ford launch a Quick Service Fix ("QSF"), "[Ford's mechanism for expediting a repair,] because 'it has been too long waiting for root cause and resolution.'" (Pl. Opp. 12) (citing Zohdy Decl. Ex. 24) The context provided by the reply email clarifies that a QSF can be launched in response to as few as ten reports of a problem like fuel tank delamination.[19] (Id.) Thus, this email too provides no evidence that Ford would have known that Coba's tanks were defective and likely to delaminate.

Coba may argue that even if these pieces of evidence are not individually sufficient, the synthesis of this "plethora" of anecdotal evidence presents a genuine issue of whether Ford had the requisite knowledge to generate a duty to disclose. However, this mass of evidence simply reinforces the conclusion that Ford was taking the delamination problem seriously and was determined to solve it, all the while believing that the problem was due to instances of

---

on super duty involving diesel engines. We had a conference call with our group yesterday and it came up quite a bit.").

[19]     "Something like this that results in a stall can be as few a[s] 10 reports so we could certainly justify it if needed." (Zohdy Decl. Ex. 24)

contaminated fuel, affecting a limited number of tanks, rather than a defectively designed tank.

Several other pieces of evidence that Coba highlights are also insufficiently probative to create a genuine issue of fact regarding Ford's knowledge. First, it points to a Ford employee's reference to fuel tank delamination as the "fuel tank *defect*" and as a "major issue for our fuel system." (Zohdy Decl. Ex. 31) (emphasis added) In context, "defect" seems to have been just a synonym for "problem," but in any event that single employee's choice of terminology does not control the issue of a design "defect," which is one of law. All of the surrounding context demonstrates that Ford believed the problem lay with the intentional or unintentional use of non-recommended fuels. Second, Coba cites a Ford email chain reporting the woes of one particular customer who needed to replace "18 injectors, 2 rear fuel tanks and 2 midship tanks due to delamination," prompting a Ford technician to ask why Ford does not use plastic tanks on Super Duty vehicles. (Zohdy Decl. Ex. 23) The technician, however, asks the question, "Is this an isolated issue, or does it happen everywhere?" The technician's comments do not demonstrate that Ford knew that the problem was a widespread one, attributable to a design defect. Finally, Coba cites that same technician's description of the delamination issue, nearly one year later, as "falling into the realm of Ford's dirty laundry" when asking whether to include the issue in a presentation to an industry conference. (Zohdy Decl. Ex. 1) The technician's instinct that Ford might not want to make a presentation about an unsolved problem in a small percentage of Ford vehicles does not suggest knowledge of a *design* defect.[20]

---

[20]     Coba also argues that a recent case from the Northern District of Ohio, *In re Ford Motor Co., Spark Plug & 3-Valve Engine Prod. Liab. Litig.*, No. 1:12-MD-2316, 2014 WL 3778592 (N.D. Ohio July 30, 2014), is instructive. The plaintiffs in that putative class action alleged that defective spark plugs in certain Ford vehicles caused consumers to incur excessive costs for spark plug replacement due to an alleged design defect that, during vehicle operation, results in the formation of asphalt-like deposits that lock the plugs in place. *Id.* at *1. The court denied Ford's motion for

Additionally, Coba asserts that even if Ford had not yet identified the root cause of the delamination (which the evidence shows it had not), Ford could nevertheless have disclosed to customers that there was a risk of delamination.[21] The relevant question, however, is not whether Ford *could* have

-------

summary judgment on the NJCFA claim, "because of the evidence in the record of Ford's actions and omissions in the face of its knowledge of the alleged defect." *Id.* at *28.

I disagree with Coba's assessment of the relevance of that case to this matter. The evidence in *Spark Plug & 3-Valve Engine* suggested that Ford was aware of both the defect and its cause prior to releasing the vehicles for consumer purchases. Although the engine containing the spark plugs at issue "was not installed in a Ford vehicle in the United States until the 2004 model year, Ford was aware of the alleged defect as early as November 1997 during the development phase." *Id.* at *2. At that time, the manufacturer warned Ford that the plugs in development "accumulate some heavy combustion deposits on the ground shield. The complaint was that the spark plug had to be completely removed with the socket. The high thread plug could not be spun out like a standard spark plug." *Id.* As early as 1999, a Ford employee recommended that a particular lubricant be applied to the spark plugs during manufacturing to solve the "removal issues." In April 2000. Ford decided to approve production for the engine with the spark plugs, despite the knowledge that the defect was severe and that there was no "fall back plan" to use alternative spark plugs. *Id.* The spark plugs continued to encounter this problem after the vehicles entered the market, with the first reports of "seized plug[s]" rolling in only "'a month or two' after the vehicles were available for purchase at Ford dealerships." *Id.*

Thus the evidence of Ford's knowledge of the design defect alleged in *Spark Plug & 3-Valve Engine* is far more robust than that in this case. Coba has not set forth any evidence to question the fact that A36 coated tanks had been working without any problem for years, and that at the time of Coba's purchase the issues that did arise were concentrated in particular geographic regions. Thus, no evidence contradicts Ford's assessment at the time that the problem was due to local fuel conditions rather than the design of the tanks' ability to withstand the acids in the fuel prevalent in the market.

[21]    Coba cites an email from Darrel Huff, a Ford employee, to Ford managers and engineers: "In the very least we should make our customers aware of the possibility this kind of corrosion can lead to a $6000+ repair due to injectors and fuel system damage and suggest a preventative measure (even if they have to pay for it themselves). At least they can then choose to pay to prevent the corrosion or take an informed risk if they choose to not take preventative steps." (Zohdy Decl. Ex. 5) However, this email was sent on May 12, 2008—over one year after Coba's purchase of the second vehicle—and therefore does not bear on what Ford knew at the time of Coba's purchases.

disclosed, but whether Ford had a *duty* to disclose. Because the information about the risk of delamination that Ford had available to it at the time was not material, Ford had no such duty to disclose.

Information is material if "a reasonable [person] would attach importance to its existence in determining [a] choice of action."[22] *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 33, 50 A.3d 75, 89 (App. Div. 2012) (citing *Restatement (Second) of Torts* § 538(2) (1977)). Materiality is assessed, not in retrospect, but from the perspective of the *prospective* buyer. For the unlucky customers whose trucks were among the approximately 1% of 6.0L diesel trucks to suffer fuel tank delamination by March 2007, the issue might be deemed material in retrospect. Some might naturally have decided to take their business elsewhere. Hence the internal Ford and Magni emails describing tank delamination as "very serious issue," a "big issue," an "ongoing issue," and a "known issue," and Ford's efforts to solve the problem.

The materiality issue, however, has a different focus. The materiality of the known risk of delamination turns on whether a reasonable consumer deciding whether to purchase a 2006 Ford F-350 Super Duty 6.0L diesel truck—ignorant, of course, of the future—would attach importance to the risk of delamination in making that decision.

Taking the evidence in the light most favorable to Coba, Ford knew in March 2007 that fuel tanks had delaminated in around 1% – 1.5% of Ford's 6.0L diesel trucks; it also knew or believed that the cause was not any design defect, but the use of non-recommended fuels containing biodiesel concentrations greater than 20%. That is a factor the consumer can control.

---

[22]     Information is also material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it." *Suarez*, 428 N.J. Super. at 33, 50 A.3d at 89 (citing *Restatement (Second) of Torts* § 538(2) (1977)). However, there is no evidence that Ford knew or had reason to know at the time of sale that Coba was likely to regard the matter as important in determining whether to purchase the vehicles.

Further, the Diesel Owner's Guide that Coba received already instructed that "Diesel Fuel containing no more than 5% of biodiesel may be used." That is a disclosure that the truck simply was not intended to run on fuel containing higher concentrations of biodiesel. That problems might arise if those instructions were ignored does not rise to the level of a material fact requiring further disclosure.

No reasonable factfinder could conclude that this information would be material to a reasonable consumer prospectively deciding, in March 2007, whether to purchase a Ford 6.0L diesel truck. Vehicles, like the Ford Super Duty trucks, are "complex instrumentalities," and defects or other problems that require maintenance or replacement of parts can be expected to arise. *See Thiedemann*, 183 N.J. at 251, 872 A.2d at 794 (2005). Indeed, "perfection, or an unlimited life span, is not attainable." *Mickens*, 2015 WL 5310755, at *8. That is particularly true where, as Ford believed, the imperfections arise from either a customer's disregard of the manufacturer's directions regarding appropriate fuels, or local instances of mislabeled or contaminated fuel. In light of all the various problems that could arise, and do arise, with Ford's or any manufacturer's trucks, Coba has failed to demonstrate a genuine issue that the known risk of delamination was material to a reasonable consumer at the time of Coba's purchases.[23]

---

[23]    Coba does not cite safety concerns as an argument that the risk of tank delamination was material to a reasonable consumer. Rather, Coba cites safety concerns as an independent basis for a duty to disclose, as discussed *infra*. However, I note that although, under different facts, safety concerns might rise to a level that they would be material, there is insufficient evidence here to create a genuine issue that Ford was aware of safety concerns of that degree.

As evidence of a safety concern, Coba points to Ford documents in which Ford employees acknowledge that delamination can cause the engine to stall. (Coba also cites an email from May 2008 about a three-vehicle accident caused by a delamination related stall, and Coba's deposition testimony that his vehicle stalled on the highway. Both occurrences are irrelevant to Ford's knowledge at the time of Coba's purchases.) There is no evidence in the record to indicate what percentage of cases of delamination result in engine stalls.

### c. Safety Concerns and Duty to Disclose

As an alternate ground for Ford's alleged duty to disclose tank delamination, Coba asserts that fuel tank delamination is a safety issue and that "Courts in this district and this Circuit have held unequivocally that a safety concern also gives rise to a duty to disclose." (Pl. Opp. 29) The parties already litigated this issue at the motion to dismiss stage, and Judge Debevoise found Coba's authority and reasoning unpersuasive. *Coba v. Ford Motor Co.*, 2013 WL 244687, at *11 (D.N.J. 2013). I too find Coba's authorities unpersuasive. Coba relies primarily on *In re Philips/Magnavox Television Litig.*, 2010 WL 3522787, *7 (D.N.J. 2010) ("A duty to disclose can arise where there is a *safety concern*, a fiduciary relationship, or where an omission is contrary to a representation actually made by the defendant.") (emphasis added), but fails to note that the quoted language is actually from three California cases. Coba also cites *Nelson v. Nissan North America, Inc.*, 894 F. Supp. 2d 558, 568–69 (D.N.J. 2012). In that case, however, the court denied a motion to dismiss because it found that the complaint sufficiently alleged that "Nissan knew and withheld from consumers information about the transmission failures." *Id.* The court also noted that the plaintiff alleged both that the defect created a dangerous condition *and* that the plaintiff incurred repair costs after the vehicle transmission failed. *Id.* This ruling, at the motion to dismiss stage, does not dictate a finding, based on the factual record before me, that a safety concern gave rise to a duty to disclose.

---

In *Mickens v. Ford Motor Co.*, I observed that the duty-to-disclose "calculus might be different for a defect that truly affected the mechanical quality or safety of an automobile. Obviously a 1% brake failure rate and a 1% hood corrosion rate would present very distinct issues as to the manufacturer's duty to warn" or disclose. No. 10-CV-5842 KM MAH, 2015 WL 5310755, at *11 (D.N.J. Sept. 10, 2015). Considered as a safety risk, tank delamination is potentially more serious than hood corrosion. However, an unspecified percentage of 1% of delamination cases that result in engine failure while driving is simply insufficient to create a genuine issue of whether Ford was aware of safety concerns that would have been material to Coba's purchases.

In addition, I agree with Judge Debevoise's reasoning that "it is unclear what logical bearing safety allegations would have on the knowledge element of a fraud claim [rather than the ascertainable loss element], and Plaintiffs present no reason why such allegations should satisfy that element." *Coba*, 2013 WL 244687, at *11. After all, if Ford had no knowledge of the alleged defect—and the information (including safety information) Ford did have was immaterial to a consumer's decision to purchase the vehicle—what does it matter for the purposes of an omissions claim that the alleged defect posed safety concerns?

For the foregoing reasons, Coba has failed to establish a genuine issue of material fact with regard to the unlawful-conduct element of its omissions claim. Coba is unable to demonstrate that Ford violated any duty to disclose the alleged material facts relating to the fuel tank delamination at the time of Coba's purchases. Therefore, I will grant summary judgment on Count 3.

## III. CONCLUSION

For the reasons set forth above, Ford's motion for summary judgment is GRANTED as to Count 3.

An appropriate Order follows.

Dated: August 4, 2017

HON. KEVIN MCNULTY, U.S.D.J.